UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

THERESA GORDON, individually and on behalf of all others similarly situated,

                        Plaintiff,

                  v.

TENCENT MUSIC ENTERTAINMENT GROUP, TENCENT HOLDINGS LIMITED, CUSSION KAR SHUN PANG, MIN HU, TONG TAO SANG, ZHENYU XIE, GUOMIN XIE, MARTIN CHI PING LAU, BRENT RICHARD IRVIN, TAK-WAI WONG, LIANG TANG, HAIFENG LIN, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS (ASIA) L.L.C., J.P. MORGAN SECURITIES LLC, DEUTSCHE BANK SECURITIES INC., MERRILL LYNCH , PIERCE, FENNER & SMITH INCORPORATED, CREDIT SUISSE SECURITIES (USA) LLC, CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, ALLEN & COMPANY LLC, BOCI ASIA LIMITED, CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, HSBC SECURITIES (USA) INC., KEYBANC CAPITAL MARKETS INC., STIFEL NICOLAUS & COMPANY, INCORPORATED,

                        Defendants.

**MEMORANDUM AND ORDER**
19-CV-5465 (LDH) (PK)

---

LASHANN DEARCY HALL, United States District Judge:

    Plaintiff Theresa Gordon, individually and on behalf of all others similarly situated, asserts claims against Defendants Tencent Music Entertainment Group ("TME"), Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Deutsche Bank Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Credit Suisse Securities (USA) LLC, Allen & Company LLC, HSBC Securities (USA) Inc., KeyBanc Capital Markets Inc., and Stifel, Nicolaus &

Company, Incorporated pursuant to the Securities Act for violations of §§ 11 and 15, and the Securities Exchange Act for violations of §§ 10(b) and 20(a).[1] Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the § 11 and § 10(b) claims for failure to state a claim.

## BACKGROUND[2]

TME is a music entertainment platform in China, providing online music, online karaoke and music-centric live streaming services. (Am. Compl. ¶ 2, ECF No. 23.) TME operates the top four music mobile apps in China. (*Id*. ¶ 58.) To provide content to its users, TME maintained exclusive licensing agreements with music labels worldwide, and obtained the publishing rights to over 90% of the music content in the Chinese market. (*Id*. ¶ 3, 62.) Exclusive ownership of certain publishing rights was a major aspect of TME's success in the Chinese market and TME aggressively protected its exclusivity against other platforms. (*Id*. ¶¶ 65-69.)

Disputes between TME and its largest competitor regarding licensing, and TME's dominance in the market drew the attention of the Chinese central government. (*Id*. ¶¶ 70, 76.) On September 12, 2017, the National Copyright Administration of China held a meeting (the "September 2017 Meeting") with principal executives from TME and its competitors and "warned these companies that they should 'avoid purchasing exclusive copyright' and 'eliminate the obstacles that are hindering expansive licensing of online music.'" (*Id*. ¶ 70.) Subsequently, in February 2018, TME opened 99% of its music library to its largest competitor, but retained

---

[1] After the motion was fully briefed, other Defendants joined the motion to dismiss: Goldman Sachs (Asia) L.L.C., (ECF No. 80), China International Capital Corporation Hong Kong Securities Limited, (ECF No. 86), BOCI Asia Limited, (ECF No. 92), China Renaissance Securities (Hong Kong) Limited, (ECF No. 105), and Cussion Kar Shun Pang, Min Hu, Tong Tao Sang, Zhenyu Xie, Guomin Xie, Martin Chi Ping Lau, Brent Richard Irvin, Tak-Wai Wong, Liang Tang, Haifeng Lin, and Tencent Holdings Limited, (ECF No. 100).

[2] The following facts are taken from the amended complaint and are assumed true for the purposes of this memorandum and order.

2

1% of its music catalog, including tracks from some best-selling Chinese artists. (*Id*. ¶¶ 71-72.) In late 2017, the National Development and Reform Commission of China ("NDRC") initiated an "examination" of TME's exclusive licensing practice. (*Id*. ¶ 75.)

On October 2, 2018, TME filed a registration statement with the Securities and Exchange Commission (the "SEC") in connection which its planned IPO on the New York Stock Exchange. (*Id*. ¶ 83.) The SEC declared an amended version of the registration statement ("Registration Statement") effective on December 11, 2018. (*Id*. ¶ 85.)

The Registration Statement contained several relevant risk disclosures.

*First*, TME disclosed the September 2017 Meeting:

> Pursuant to an article posted on National Copyright Administration's official website, in September 2017, the National Copyright Administration held meetings with a number of music industry players, including us, where it encouraged the relevant industry players to 'avoid acquiring exclusive music copyright' and indicated that they should also not engage in activities involving 'collective management of music copyright.' There is substantial uncertainty as to whether some of our current licensing arrangements may be found objectionable by the regulatory authorities in the future.

(*Id*. ¶ 91.)

*Second*, TME discussed the potential impact of a changing legal and regulatory landscape in China:

> PRC laws and regulations concerning the online music entertainment industry are developing and evolving. Although we have taken measures to comply with the laws and regulations that are applicable to our business operations and avoid conducting any non-compliant activities under the applicable laws and regulations, the PRC governmental authorities may promulgate new laws and regulations regulating the online music industry in the future. We cannot assure you that our practice would not be deemed to violate any new PRC laws or regulations relating to online music streaming. Moreover, developments in the online music entertainment industry may lead to changes in PRC laws, regulations and policies or in the interpretation and application of existing laws, regulations and policies that may limit or restrict online reading marketplaces like us, which could materially and adversely affect our business and operations.

(*Id.* ¶ 89.)

Like the Registration Statement, TME's 2018 Annual Report contained various disclosures regarding the risks faced by TME, using substantially the same language in many instances as the Registration Statement. (*See, e.g., id.* ¶ 106.)

China's anti-monopoly regulator (the "SAMR") launched an official investigation into TME's potentially monopolistic practices regarding music licensing in January 2019. (*Id.* ¶ 75.) News outlets reported on this investigation in August 2019. (*Id.* ¶ 9-10, 109.) On September 26, 2019, Plaintiff filed the instant action. (ECF No. 1.)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of defendants' liability for the alleged misconduct. *Id*. While this standard requires more than a "sheer possibility" of defendants' liability, *id*., "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id*. (citations omitted).

**DISCUSSION**

**I.     Securities Act[3]**

Section 11 of the Securities Act imposes liability on issuers and other signatories of a registration statement that, upon becoming effective, "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Plaintiff has conceded that the Registration Statement does not include any untrue statement of fact. (*See, e.g.,* Pl.'s Mem. Opp'n Mot. Dismiss ("Pl.'s Opp'n.") 8, ECF No. 73 ("This statement, while literally true, is misleading."); Defs.' Joint Reply Mem. Supp. Mot. Dismiss ("Defs.' Reply") 1, ECF No. 74.) As such, Plaintiff relies on an omission theory of liability.

To plead a § 11 claim on the basis of an omission theory, a plaintiff must allege "a legal obligation to disclose the allegedly omitted information." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003). A duty to disclose may arise (1) "when additional information is needed to make another statement, whether required or voluntarily made, not misleading;" or (2) "may be imposed by statute or by regulation." *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d. 366, 375 (S.D.N.Y. 2009), *aff'd sub*

---

[3] Defendants argue that Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies to Plaintiff's § 11 claim because it sounds in fraud. (Defs.' Joint Mem. Supp. Mot. Dismiss ("Defs.' Mem.") 9-10, ECF No. 72-1.); *see Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (observing that Rule 9(b)'s heightened pleading requirements apply to Section 11 Securities Act claims "insofar as the claims are premised on allegations of fraud"). To determine whether Rule 9(b) applies, a court looks to whether "the gravamen of the complaint is plainly fraud." *Id.* at 172 (quotation marks and citation omitted). Plaintiff's complaint is structured with introductory factual section that applies to both their Securities Act and Exchange Act claims. (Am. Compl. ¶¶ 1-104.) Plaintiff's § 11 claims explicitly disclaim any allegation of fraud, recklessness, or intentional misconduct. (*Id.* ¶ 117.) And, all allegations specifically regarding fraud are alleged with respect to their Exchange Act claim. (*Id.* ¶ 133-148.) This is not a situation in which the fraud and non-fraud claims were pleaded in the alternative "so poorly that a court is unable to figure out which allegations are intended to support which claim." *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 116 (S.D.N.Y. 2010). Rather, "each portion [is] sufficient to stand alone for its respective pleading purposes, though essentially duplicating and overlapping large components of the other." *Id.* (finding that two-part complaint did not sound in fraud). Accordingly, Plaintiff's § 11 claim is not subject to the Rule 9(b) pleading standard.

5

*nom. In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010); *see also In re Vivendi*, S.A. Sec. Litig., 838 F.3d 223, 239–40 (2d Cir. 2016) (explaining with respect to a § 10(b) claim that "half-truths" are statements that are misleading because of what they omit to disclose[4]).

### A. Duty to disclose additional information to ensure another statement is not misleading

#### 1. September 2017 Meeting

Defendants argue that Plaintiff has failed to identify any material shortcoming in TME's disclosure related to the September 2017 Meeting. (Defs.' Joint Mem. Supp. Mot. Dismiss ("Defs.' Mem.") 17.) The Court agrees.

The disclosure states in relevant part:

> Pursuant to an article posted on National Copyright Administration's official website, in September 2017, the National Copyright Administration held meetings with a number of music industry players, including us, where it encouraged the relevant industry players to "avoid acquiring exclusive music copyright" and indicated that they should also not engage in activities involving "collective management of music copyright." There is substantial uncertainty as to whether some of our current licensing arrangements may be found objectionable by the regulatory authorities in the future.

(Am. Compl. ¶ 91.) Plaintiff argues that this statement is misleading in two respects. *First*, it suggests that TME was a mere participant at the September 2017 Meeting when it was indeed a target. (Pl.'s Mem. 8-9). To this point, Plaintiff argues that "Defendants' statements misled investors by implying that [TME] only faced the same risks as its competitors." (Pl.'s Opp'n 9.) *Second*, the statement wrongly asserts that the Chinese government only encouraged the

---

[4] Analysis regarding whether a statement was a materially misleading statement under § 10(b) is applicable to a § 11 claim. *See Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (noting that the same standard for materially misleading statements applies to § 10(b) and § 11).

6

participants to avoid exclusive licensing when in fact the government ordered them to do so. (Pl.'s Opp'n. 9.)

Tellingly, this section of Plaintiff's opposition fails include citations to the complaint. This is not surprising as the allegations do not support her argument. Plaintiff alleges that disputes between TME and its largest competitor, and TME's market dominance "drew the attention of the Chinese central government," and executives from four companies participated in the September 2017 Meeting. (Am. Compl. ¶ 70.) And, at that meeting, the competitors were notified that "their battles over exclusive licensing had been on the government's radar." (*Id.*) According to the complaint, the National Copyright Administration only "warned" the companies in attendance that they should "avoid purchasing exclusive copyright" and "eliminate the obstacles that are hindering expansive licensing of online music." (*Id.*; *see also id.* ¶ 76.) There is no mention of any purported order. Nor is there any allegation to support the inference that TME was the "target" of the meeting. At bottom, the Registration Statement describes the directive of the September 2017 Meeting in largely the same terms as alleged by Plaintiff. There is no misstatement.

Nonetheless, in an effort to convince the Court that Defendants' statement regarding the September 2017 Meeting was misleading, Plaintiff directs the Court to *In re Allergan PLS Sec. Litig.*, No. 18 CIV. 12089 (CM), 2019 WL 4686445, at *9–10, 22-23 (S.D.N.Y. Sept. 20, 2019), which Plaintiff maintains is analogous. (Pl.'s Opp'n 9.) It is not. In *In re Allergan* the court was charged to determine whether statements related to the risks associated with a company's breast implant product were misleading. *Id.* at *22-23. There, the district court found that it was reasonable to infer from the complaint that studies had shown the company's implants were more closely associated with cancer than other implant products on the market. *Id.* at *23. The court

7

found that the disclosure at issue was misleading because it resulted in the false impression that the company's implants were no more linked to cancer than other implants. *Id.* at *25. *In Re Allergan* is inapposite. Unlike in *In re Allergan*, Plaintiff has not sufficiently alleged that TME was the target of the September 2017 Meeting or faced risks of a government inquiry unique amongst its competitors. Thus, even if the statement implied that "[TME] only faced the same risks as its competitors" there is no basis to infer that such an implication would be misleading. (Pl.'s Opp'n 9.) There is no misstatement here.

Lastly, Plaintiff argues that the statement, "[t]here is substantial uncertainty as to whether some of our current licensing arrangements may be found objectionable by the regulatory authorities in the future," was misleading because at the September 2017 Meeting, the Chinese government had already told TME that it found its licensing agreements "objectionable." (Pl.'s Opp'n 11.) However, this argument is only potentially viable if the Court were to view the statement in isolation, which it will not do. That is, the Court does not look to whether "particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities." *See Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (citation and modification omitted). As discussed, the statement that immediately preceded the sentence at issue accurately describes what Plaintiff alleges occurred at that the September 2017 Meeting—namely that government regulators warned TME to avoid exclusive agreements. (Am. Compl. ¶ 91.) Thus, to the extent that what occurred at the September 2017 Meeting provides a basis to conclude that the government "objected" to any of TME's practices—that fact was disclosed. That the Registration Statement further states there is substantial uncertainty as to

8

what may happen with respect to its licensing arrangements in the future does not alter that conclusion nor somehow obscure what was disclosed. Again, there is no misstatement here.

### 2. Government Investigation

Plaintiff alleges that the statement "[t]here is substantial uncertainty as to whether some of our current licensing arrangements may be found objectionable by the regulatory authorities in the future" was also misleading because there was already an ongoing government investigation, which was not disclosed. (Pl.'s Opp'n 10-11 (citing Am. Compl. ¶ 91).)

In is undisputed that the official investigation was not launched until January 2019, after the Registration Statement was published. (Am. Compl. ¶¶ 75, 85.) And, as Defendants argue, Plaintiff has only pleaded vague allegations of an "examination" that was conducted beginning in late 2017, prior to the official investigation. (*Id.* ¶ 75.) Therefore, to start, the Court is not altogether convinced that Plaintiff has plausibly pleaded that any government investigation was ongoing prior to January 2019—one month after the Registration Statement was filed.[5] Nevertheless, even if the Court were to construe the allegations as Plaintiff urges—that a government investigation related to TME's licensing practices was ongoing starting in late 2017, which defendants were aware of—there is no actionable omission related to any such investigation.[6]

---

[5] Moreover, Plaintiff has not pleaded any allegation that TME was notified about the existence of any examination or investigation in late 2017.

[6] In her response to Defendants' request for a pre-motion conference on the anticipated motion to dismiss, Plaintiff requested that the Court incorporate an article by reference into the complaint. (ECF 68 at 2 n.1.) This article, published on April 25, 2018 states that "[TME] is facing abuse of dominance allegations in China following complaints from competitor NetEase Cloud Music . . . . Preliminary investigations were launched recently by the National Development Reform Commission (NDRC) and the State Administration for Industry and Commerce (SAIC) and involve China's music copyright market, the sources said." (ECF 68-1.) Plaintiff did not fashion her letter as a motion to the Court to amend her complaint. Curiously, despite previously requesting the Court incorporate the article by reference into the complaint, in her opposition to Defendants' motion to dismiss, Plaintiff now argues that the Court should not incorporate the same article by reference. (Pl.'s Opp'n 19.) In any event, Plaintiff has made no formal motion to incorporate this article by reference into the complaint, which would have been denied absent an amendment. And, even if the Court did consider the factual allegations in the article, the facts contained therein do not alter the Court's analysis. That is, the article states that there was a preliminary

9

As the Second Circuit has explained, "[d]isclosure is not a rite of confession," and companies do not have a duty "to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). It follows, therefore, the existence of "a government investigation, without more, does not trigger a generalized duty to disclose." *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016). What constitutes the something "more" necessary to trigger a duty to disclose is well-illustrated by *Menaldi v. Och-Ziff Capital Mgmt. Grp.,* 164 F. Supp. 3d 568 (S.D.N.Y. 2016) and *Christine Asia Co. v. Ma.,* 718 F. App'x 20 (2d Cir. 2017)—each cited by Plaintiff to support her argument that TME had a duty to disclose the investigation. Unfortunately for Plaintiff, each case is distinguishable from the case at bar.

In *Och-Ziff,* the company stated in its public disclosures that regulatory scrutiny "has resulted . . . in regulatory agency investigations, litigation, and subpoenas," and that "[w]e are not currently subject to any pending regulatory, administrative or arbitration proceedings that we expect to have a material impact on our results of operations or financial condition." 164 F. Supp. 3d at 583. The *Och-Ziff* court found that such statements were misleading because they suggested "that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation." *Id.* Indeed, those statements were made after an investigation had commenced and the company had received subpoenas from the SEC and requests for information from DOJ. *Id.* And, in later filings, the company explicitly acknowledged that an adverse outcome in the investigation, which the company described in great detail, "could have material effect" on its business. *Id.* at 584. The *Och-Ziff* court stated that "the question here is not whether Och-Ziff had an independent duty to announce

---

investigation as of April 2018. Because the Court's analysis is based upon an alleged investigation ongoing since late 2017, it necessarily addresses the time frame raised by the article .

10

the SEC-DOJ Investigation; it is whether, in light of that Investigation, the statements Och-Ziff chose to make were materially misleading." *Id.* at 584. In part because *Och-Ziff* later conceded in SEC filings that such an investigation could have a material impact, the court found that plaintiffs had plausibly pleaded that Och-Ziff's initial statements were materially misleading. *Id.* at 584. By way of contrast, here, there is no allegation to support the claim that any investigation would materially impact TME. *Och-Ziff*, therefore, is not, as Plaintiff presses, indistinguishable from the instant action, and does not support her claim. (*See* Pl.'s Opp'n 12.)

In *Christine Asia Co. v. Ma*, Alibaba, an e-commerce company, had failed to disclose a meeting in which a "powerful" Chinese agency had a warned that unless Alibaba addressed the issue of counterfeit goods on its website, it would be subject to repeating fines of 1% of daily gross merchandise sold on Alibaba's e-commerce platform. 718 F. App'x at 22. The meeting further resulted in a white paper, which was published briefly online, which detailed the meeting and the administrative guidance given to the company at that meeting. *Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 465 (S.D.N.Y. 2016), *vacated and remanded sub nom. Christine Asia Co. v. Ma*, 718 F. App'x 20 (2d Cir. 2017). The Second Circuit determined that this information was "highly material" to investors because the threat of penalties required Alibaba to choose between giving up an important source of its revenue or risking massive fines, and either outcome would have significant negative impact on Alibaba's revenues and on the success of its IPO. *Christine Asia*, 718 F. App'x at 22. Accordingly, the Second Circuit vacated the opinion of the district court and found that Alibaba had a duty to disclose these facts in a manner that accurately conveyed the seriousness of the problems Alibaba faced, and therefore plaintiff had pleaded an actionable misstatement or omission. *Christine Asia Co.*, 718 F. App'x at 23. There, the potentially significant economic penalties that

11

would be levied should the company not comply with the regulator's directive were specifically defined by the regulator and communicated to the company. Here, by way of contrast, there are only vague, speculative allegations that an on-going investigation into TME "could impose significant fines and penalties on its business, as well as diminish revenue from transactions that violate anti-monopoly laws." (Am. Compl. ¶ 90.) In the absence of a plausible allegation that TME was aware of any material impact of any investigation on TME, there is no cognizable claim for a misstatement or omission.[7]

Because Plaintiff alleged only that there was a government investigation, without more, the statement that "[t]here is substantial uncertainty as to whether some of our current licensing arrangements may be found objectionable by the regulatory authorities in the future" was not misleading.

### 3. Violation of Chinese Anti-Monopoly laws

Plaintiff alleges that the statement that TME "ha[s] taken measures to comply with the laws and regulations that are applicable to [its] business and avoid conducting any non-compliant activities under the applicable laws and regulations" was misleading because TME knew and failed to disclose that it was violating anti-monopoly laws. (Am. Compl. ¶¶ 89-90.) Plaintiff argues that TME was aware that it was violating Chinese law because TME was directed to "cease and desist" at the September 2017 Meeting. (Pl.'s Opp'n 16-17.) However that is not supported by the allegations in the complaint. As already discussed, Plaintiff pleaded that the National Copyright Administration only "warned" the companies in attendance that they "should

---

[7] That Plaintiff pleaded that there is a Chinese law that prohibits companies with dominant market positions from engaging in exclusive licensing deals without justifiable reasons and penalties from violations can result in up to 10% of sales achieved in the previous year does not change the Court's analysis. (Am. Compl. ¶¶ 78-82.) The existence, generally, of available harsh penalties under the law is not equivalent to a company being specifically put on notice by a government regulator of a penalty that would materially impact its business.

12

avoid purchasing exclusive copyright" and "eliminate the obstacles that are hindering expansive licensing of online music." (Am. Compl. ¶ 70.) There was no representation made by the National Copyright Administration that any company's conduct was violating anti-monopoly law nor any mandatory order given at that meeting.

Even assuming Plaintiff plausibly pleaded that TME's licensing agreements violated Chinese law, Defendants argue that TME's failure to accuse itself of violating anti-monopoly law is not a cognizable omission. (Defs.' Mem. 12.) The Court agrees. Federal securities laws do not require a company to accuse itself of wrongdoing. *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (collecting cases), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006). Plaintiff's cited authority does not compel a different finding. (Pl's Opp'n 15.)

In *In re Petrobras Sec. Litig.*, the company was alleged to have inflated the amount that it paid for various construction contracts as a result of bribes the company was receiving. 116 F. Supp. 3d 368, 375 (S.D.N.Y. 2015). And, as a result of the inflated contract values, the valuation of certain carrying costs and net income on its balance sheets was likewise inflated. *Id.* at 375-76. However, the issue in *In re Petrobras* was not whether Petrobras needed to disclose the unlawful acceptance of bribery payments because of their illegal nature. Rather, the concealment of the bribery payments led to erroneous financial statements, which "call[ed] into question the integrity of the company as a whole," and resulted in material misstatements related to the value of Petrobras' oil-producing infrastructure, the core of its business. *Id.* at 380. There are no allegations here that any purported illegal anti-competitive conduct resulted in inaccurate financial reporting, let alone that which might go to the core of TME's business. *In re Petrobras* is simply not applicable.

And, in *In re Van der Moolen Holding N.V. Sec. Litig.*, the complaint alleged that the defendants made numerous statements concerning the sources and significance of the revenue generated by the defendants, while the company had failed to disclose that the company's revenue had been generated, at least in part, by trading practices known to have violated the rules of the New York Stock Exchange. 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005). The *Van de Moolen* court observed that a defendant does not have a duty to speculate about the risk of future investigation or litigation. *Id.* at 400. As an exception, "if [the defendant] puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success[.]" *Id.* at 400-401 (internal quotation and citation omitted). In *Van de Moolen,* the plaintiffs cited to specific and numerous statements that defendants made concerning the sources and significance of their revenue, which was the basis for the court finding that the defendant's violated their duty to disclose the information concerning the source of its success. *Id.* Here, however, Plaintiff fails to allege that any statement TME made put the topic of the cause of its financial success at issue. Accordingly, *In re Van der Moolen* provides no support for her argument.

At bottom, in *In re Petrobras* and *In re Van der Moolen*, a duty to disclose arose because the companies made specific material statements that were false because of the company's wrongdoing. Here, meanwhile, TME disclosed that it "ha[d] taken measures to comply with the laws and regulations that are applicable to [its] business operations and avoid conducting any non-compliant activities under the applicable laws and regulations," but changes to laws or policies or interpretations of existing laws and policies could ultimately limit or restrict its business model "which could materially and adversely affect our business and operations." (Am. Compl. ¶ 89.) The Court agrees with Defendants that Plaintiff has failed to plead that TME's

14

allegedly unlawful conduct rendered this statement or any other materially misleading by suggesting that TME's performance was better than it actually was. (Defs.' Reply 2.) Accordingly, Plaintiff has not pleaded any duty to disclose allegedly anti-monopolistic conduct.

### B. Statutory Duty

Lastly, Plaintiffs allege that TME had a statutory duty to disclose the investigation under SEC Regulation S–K, Items 303 and 503. (Am. Compl. ¶¶ 95-102, 104.) Defendants argues that there was no statutory duty to disclose the investigation. (Defs.' Mem. 18-20.) The Court agrees.

Item 303 requires registrants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303; *see also Stratte McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). However, as other courts in this circuit have found, the alleged existence of an investigation alone does not support an inference that the company "expected, or reasonably should have expected, that it would later incur fines or liabilities (or both) that would impact its future financial results materially." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 81, 82-84 (S.D.N.Y. 2015) (finding no duty to disclose under Item 303 where the company did not disclose a multi-state investigation into the company's death benefits payment practices); *see also Lewis v. YRC Worldwide Inc.*, No. 119-CV-0001 (GTS)(ATB), 2020 WL 1493915, at *10 (N.D.N.Y. Mar. 27, 2020) (finding no duty to disclose under Item 303 where defendant did not disclose the existence of a nine-year DOJ investigation that originated from a qui tam action, because, in part, the DOJ repeatedly extended the time that the action was to remain under seal, and "it is not reasonable to expect [d]efendants to have known the outcome of the nine-year DOJ investigation"). Moreover,

15

Plaintiffs allege that TME, as a foreign private registrant, failed to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals"—namely, the government investigation.  (Compl. ¶ 101 (citing 17 C.F.R. § 229.303).)  However, as Defendants argue, Plaintiff cites to no authority for the proposition that investigations are considered governmental policies or factors that would compel a duty to disclose here.  (Defs.' Reply 7.)  Nor is the Court aware of any.  Accordingly, Plaintiff has not plausibly alleged that Defendants failed to satisfy any duty to disclose under Item 303.

Moreover, Item 503 does not supply a basis for a duty to disclose here.  Item 503(c) requires that a registrant disclose "the most significant factors that make the offering speculative or risky."[8]  The "most significant factors" standard is a "considerably high" standard, and goes beyond materiality.  *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 89 (S.D.N.Y. 2017) (finding that while the alleged omissions at issue were material, they did not rise to the level of the considerably higher "most significant factors" standard of Item 503).  Given that Plaintiff has not sufficiently pleaded a material omission, she has not pleaded the Defendants failed to satisfy the higher standard of Item 503.

## II.  Exchange Act

To state a claim for relief under § 10(b) and Rule 10b–5, a plaintiff must allege that defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff relied; and (5) that

---

[8] On May 2, 2019, the SEC relocated the former Item 503(c), then-codified at 17 C.F.R. § 229.503(c), to Item 105, now codified at 17 C.F.R. § 229.105.  The Court nonetheless refers to the claim as an Item 503 claim for the sake of consistency with the parties' pleadings and briefings.

16

plaintiff's reliance was the proximate cause of their injury. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). As the Court has already found there is no material misstatement or omission in the Registration Statement, the only remaining basis for Plaintiff's Exchange Act claim are statements made in the Annual Report. Plaintiff and Defendants are in agreement that the Annual Report contains largely the same disclosures as the Registration Statement. (Pl.'s Opp'n 24; Defs.' Reply 10.) The only difference that Plaintiff alleges is that the Annual Report was published on April 19, 2019, (Am. Compl. ¶ 105), after the official investigation into TME was launched in January 2019, (*id.* ¶ 75). However, as already discussed, the existence of a government investigation alone does not create a duty to disclose. Accordingly, for the reasons already stated related to the Registration Statement, Plaintiff's Exchange Act claims fail.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the § 11 and § 10(b) claims is GRANTED.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2021

/s/ LDH
L<small>A</small>SHANN D<small>E</small>ARCY HALL
United States District Judge