**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Jing Chen, Esq.
Jonathan Horne, Esq.
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com
jchen@rosenlegal.com
jhorne@rosenlegal.com

*Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THERESA GORDON, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TENCENT MUSIC ENTERTAINMENT GROUP, TENCENT HOLDINGS LIMITED, CUSSION KAR SHUN PANG, MIN HU, TONG TAO SANG, ZHENYU XIE, GUOMIN XIE, MARTIN CHI PING LAU, BRENT RICHARD IRVIN, TAK-WAI WONG, LIANG TANG, HAIFENG LIN, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS (ASIA) L.L.C., J.P. MORGAN SECURITIES LLC, DEUTSCHE BANK SECURITIES INC., MERRILL LYNCH , PIERCE, FENNER & SMITH INCORPORATED, CREDIT SUISSE SECURITIES (USA) LLC, CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, ALLEN & COMPANY LLC, BOCI ASIA LIMITED, CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, HSBC SECURITIES (USA) INC., KEYBANC CAPITAL MARKETS INC., STIFEL NICOLAUS & COMPANY, INCORPORATED,<br><br>Defendants. | Case No: 1:19-cv-05465-KAM-SMG<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiffs Euclidean Investment LLC and Andrey Zaborsky ("Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation it conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) Tencent Music's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Tencent Music's public filings with Chinese regulatory agencies and its local provincial offices; (iii) public reports and news articles; (iv) transcripts of Tencent Music's conference calls; (v) interviews with witnesses with relevant information; and (vi) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Tencent Music Entertainment Group ("Tencent Music" or the "Company") American Depositary Shares ("ADSs")[1] from December 12, 2018 through August 26, 2019, inclusive (the "Class", and the period from December 12, 2018 through August 26, 2019 is the "Class Period").[2] Plaintiffs bring

[1] American Depositary Shares, also known as ADSs, are U.S. dollar-denominated shares of stock of a foreign-based company available for purchase on an American stock exchange. ADSs are issued by depository banks in the U.S. under agreement with the issuing foreign company.

[2] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Tencent Music at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns,

the following claims on behalf of the Class: (1) Section 11 and Section 15 claims under the Securities Act of 1933 (the "Securities Act") for all purchasers of Tencent Music ADSs pursuant or traceable to the Registration Statement and Prospectus in connection with Tencent Music's initial public offering (collectively the "Registration Statement") held on or about December 12, 2018 (the "IPO" or "Offering"); and (2) Section 10(b) and Section 20(a) claims under the Securities Exchange Act of 1934 (the "Exchange Act") for all purchasers of Tencent Music ADSs during the Class Period.

2. Defendant Tencent Music is the largest online music entertainment platform in China, providing online music, online karaoke and music-centric live streaming services. The Company owns the top four Chinese music mobile apps and controls the largest music content library in China of over 30 million tracks from domestic and international music labels. It dominates 83.8% of the Chinese online music market, dwarfing the combined market share of the second and third largest players in China, NetEase Cloud Music and Alibaba, by over 60%.[3] In the fourth quarter of 2018 alone, Tencent Music's platform attracted over 800 million total unique monthly active users ("MAU") and 27 million paying users. In the first quarter of 2019, it had more MAU than any other streaming platform in the world, including well-known names like Spotify, Amazon Music, Apple Music or YouTube.[4]

3. Tencent Music's success was largely built on the vast reservoir of exclusive licensing agreements it negotiated with major music labels worldwide, including Universal Music

---

and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

[3] https://www.reuters.com/article/us-kaola-m-a-Tencent_Music/Tencent_Music-dials-up-luxury-push-with-2-billion-buy-of-netease-e-commerce-arm-idUSKCN1VR02D

[4] https://www.counterpointresearch.com/global-online-music-streaming-revenues-cross-us11-billion-h1-2019/

Group, Sony Music Group and Warner Music Group and many popular Chinese artists. It was estimated that Tencent Music controlled exclusive rights to over 5 million tracks in China.[5] Such exclusivity denied its competitors access to millions of popular and profitable music tracks in China and prevented its competitors from effectively competing with Tencent Music.

4. On September 12, 2017, the National Copyright Administration of the People's Republic of China met with Tencent Music and ordered Tencent Music that it "shall avoid purchasing exclusive licensing" of digital music tracks, "shall … eliminate the illegal or unreasonable obstacles that are hindering expansive licensing and distributing of online music," and "shall not engage in collective management[6] of music copyrights in any form" (the "September 2017 Order").[7] The National Copyright Administration also invited other music companies to the meeting so they could observe their discipline of Tencent as a warning to them against the practice of exclusive music licensing. After the September 2017 Meeting, Tencent Music reluctantly opened 99% of its music library to its competitors, charging 100% markup sublicensing fees.

5. Despite the Chinese central government's express directive, however, Tencent Music continued to engage in exclusive licensing of digital music from popular artists and music labels worldwide. Additionally, Tencent Music withheld from sublicensing to its competitors 1% of its music database which were the most popular songs in China and ***the*** songs that could bring users and revenues to its music platform.

6. Tencent Music's refusal to follow the government's orders forced the Chinese central government to begin an investigation into its exclusive licensing practices. At the end of

---

[5] http://www.21jingji.com/2019/3-16/zMMDEzODFfMTQ3NjYzMw.html

6 The term "collective management" is better understood to mean "collusion in the collective management" of copyrights.

[7] http://www.ncac.gov.cn/chinacopyright/contents/518/349213.html, last viewed on April 27, 2020. The original publication and a certified English translation are attached hereto as Exhibit 1.

2017, the National Development and Reform Commission of China ("NDRC") launched an investigation into Tencent Music's monopolistic practices, which was immediately followed by an investigation by the State Administration For Industry and Commerce ("SAIC"). SAIC also sent interrogatories to Tencent Music regarding its investigation. In April 2018, the Chinese government created a new central governmental executive agency - the powerful State Administration for Market Regulation of China ("SAMR") – which took over all anti-trust enforcement responsibilities that were historically divided among several executive agencies. SAMR inherited the NRDC and SAIC investigations and continued them.

7. Even as it faced an investigation by a powerful Chinese agency into its exclusive licensing practices which were the foundation of its profitable business, on December 12, 2018, Tencent Music completed a $1.1 billion IPO – one of the largest ever by a Chinese company.

8. The Registration Statement that Tencent Music filed with the SEC in connection with its IPO was misleadingly incomplete. It mischaracterized the September 2017 meeting as an industry get-together to discuss future policy. It also omitted to disclose that Tencent Music was the subject of the aggressive on-going anti-monopoly investigation into its core business practices conducted by one of the Chinese central government's most powerful agencies. In fact, it affirmatively stated that there were no ongoing government investigations that could have a material impact on its business.

9. On August 14, 2019, before the market opened, Red Pulse, an intelligence platform covering China's economy and capital markets, reported that the SAMR was investigating Tencent Music for violating China's anti-monopoly laws because of its exclusive licenses with Universal Music, Sony Music, and Warner Music. On this news, the price of Tencent Music ADS dropped 5.36%, or $0.78 per ADS, on unusually high trading volume of nearly 8 million shares.

10. On August 27, 2019, before the market opened, Bloomberg published an article entitled "Tencent Music Dives as Watchdog Probes Its Record-Label Ties", further exposing the prohibitively high sublicensing fees that Tencent Music charged its competitors and highlighting the risks of potential regulatory actions that could negatively affect Tencent's business. On this news, the price of Tencent Music ADS further dropped 6.82%, or $0.92 per ADS, on high volume of over 12 million shares traded.

11. The two declines caused by news of the antitrust investigation collectively erased $187 million in shareholder value.

## **JURISDICTION AND VENUE**

12. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because certain of the acts and conduct complained of herein, such as the trading of Tencent Music ADSs on the New York Stock Exchange ("NYSE"), occurred in this District.

15. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including

but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

**PARTIES**

16. Lead Plaintiff Euclidean Investment LLC purchased Tencent Music ADS pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. Its PSLRA certification has been previously filed with the Court and is incorporated by reference herein.

17. Lead Plaintiff Andrey Zaborsky purchased Tencent Music ADS pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. His PSLRA certification has been previously filed with the Court and is incorporated by reference herein.

18. Defendant Tencent Music is headquartered in China and incorporated in the Cayman Islands. Its ADSs are traded on the NYSE under the ticker symbol "TME."

19. Defendant Tencent Holdings Limited is a Cayman Islands company and headquartered in China. It is a leading provider of internet value-added services in China, offering a broad range of internet services including communications and social, online games, digital content, online advertising, mobile payment, mobile utilities and other services. Tencent Holdings Limited operates the largest online social community in China. At all relevant times herein, Tencent Holdings Limited was and is a controlling shareholder of Tencent Music.

20. Defendant Cussion Kar Shun Pang ("Pang") is and, at all relevant times during the Class period, was the Chief Executive Officer of Tencent Music. He has been a member of the board of directors since May 2014. In addition, Defendant Pang served as the head of QQ Music, one of the top music apps that Tencent Music owns, since 2014.

21. Defendant Min Hu ("Hu") is and, at all relevant times during the Class period, was the Chief Financial Officer of Tencent Music, in charge of the Company's finance and corporate IT functions.

22. Defendant Tong Tao Sang ("Tong") was Chairman of Tencent Music's Board of Directors at the time of the IPO and throughout the Class Period.

23. Defendant Zhenyu Xie ("Zhenyu") was a member of Tencent Music's Board of Directors and Co-President at the time of the IPO.

24. Defendant Guomin Xie ("Guomin") was a member of Tencent Music's Board of Directors and Co-President at the time of the IPO.

25. Defendant Martin Chi Ping Lau ("Lau") was a member of Tencent Music's Board of Directors at the time of the IPO.

26. Defendant Brent Richard Irvin ("Irvin") was a member of Tencent Music's Board of Directors at the time of the IPO.

27. Defendant Tak-Wai Wong ("Wong") was a member of Tencent Music's Board of Directors at the time of the IPO.

28. Defendant Liang Tang ("Tang") was a member of Tencent Music's Board of Directors at the time of the IPO.

29. Defendant Haifeng Lin ("Lin") was a member of Tencent Music's Board of Directors at the time of the IPO.

30. Defendants Pang, Hu, Tong, Zhenyu, Guomin, Lau, Irvin, Wong, Tang and Lin are collectively referred to herein as the "Individual Defendants."

31. Defendants Pang and Hu are the "Exchange Act Individual Defendants."

32. Defendant Tencent Music, Tencent Holdings Limited, and the Individual Defendants are the "Defendants."

33. The Individual Defendants and Tencent Limited Holdings each reviewed, signed and/or approved the Registration Statement.

34. The senior management of Tencent Music, including Defendants CEO Pang and CFO Hu, as executive officers and authorized representatives of Tencent Music, participated in the solicitation and sale of Tencent Music ADSs to investors in the IPO, motivated in part to serve their own and the Company's financial interests.

35. Defendants CEO Pang and CFO Hu, along with other Tencent Music senior executives, attended investor roadshow presentations and met with investment analysts and large investors in the weeks leading up to the IPO in an effort to persuade investors that Tencent Music was a worthy investment and solicit investors to purchase ADSs in the IPO, all to further the financial interests of Tencent Music.

36. Each of the Exchange Act Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the federal securities laws.

37. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the IPO and sold 22,140,000 ADSs for which it received certain fees and commissions. Morgan Stanley has offices located at 1585 Broadway, New York, New York 10036.

38. Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") served as an underwriter for the IPO and sold 16,400,000 ADSs for which it received certain fees and commissions. Goldman Sachs has offices located at 68th Floor, Cheung Kong Center, 2 Queen's Road Central, Hong Kong.

39. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the IPO and sold 12,257,012 ADSs for which it received certain fees and commissions. J.P. Morgan has offices located at 383 Madison Avenue, New York, New York 10179.

40. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") served as an underwriter for the IPO and sold 12,257,012 ADSs for which it received certain fees and commissions. Deutsche Bank has offices located at 60 Wall Street, 2nd Floor, New York, New York 10005

41. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as an underwriter for the IPO and sold 12,257,012 for which it received certain fees and

commissions. Merrill Lynch has offices located at 50 Rockefeller Plaza, NY1-050-12-01, New York, New York 10020.

42. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the IPO and sold 836,121 ADSs for which it received certain fees and commissions. Credit Suisse has offices located at 11 Madison Avenue, New York, NY 10010.

43. Defendant China International Capital Corporation Hong Kong Securities Limited ("CICC") served as an underwriter for the IPO and sold 1,672,241 ADSs for which it received certain fees and commissions. CICC has offices located at 1 International Finance Centre 1 Harbour View Street, 29th Fl Central Hong Kong.

44. Defendant Allen & Company LLC ("Allen") served as an underwriter for the IPO and sold 696,767ADSs for which it received certain fees and commissions. Allen has offices located at 711 5th Ave, New York, NY 10022.

45. Defendant BOCI Asia Limited ("BOCI") served as an underwriter for the IPO and sold 696,767ADSs for which it received certain fees and commissions. BOCI has offices located at 26/F Bank of China Tower 1 Garden Road Hong Kong Hong Kong.

46. Defendant China Renaissance Securities (Hong Kong) Limited ("Renaissance") served as an underwriter for the IPO and sold 696,767ADSs for which it received certain fees and commissions. Renaissance has offices located at Units 8107-08, International Commerce Centre No.1 Austin Road West, Kowloon, Hong Kong.

47. Defendant HSBC Securities (USA) Inc. ("HSBC") served as an underwriter for the IPO and sold 696,767ADSs for which it received certain fees and commissions. HSBC has offices located at 452 Fifth Ave, New York, New York 10018.

48. Defendant KeyBanc Capital Markets Inc. ("KeyBanc") served as an underwriter for the IPO and sold 696,767ADSs for which it received certain fees and commissions. KeyBanc has offices located at 1301 6th Ave, New York, NY 10019.

49. Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter for the IPO and sold 696,767ADSs for which it received certain fees and commissions. Stifel has offices located at 501 North Broadway, St. Louis, Missouri 63102.

50. Defendants Morgan Stanley, Goldman Sachs, J.P. Morgan, Deutsche Bank, Merrill Lynch, Credit Suisse, CICC, Allen, BOCI, Renaissance, HSBC, KeyBanc, Stifel are collectively referred to herein as the "Underwriters."

51. Tencent Music, Tencent Holdings Limited, the Individual Defendants, and the Underwriters are collectively referred to hereinafter as "Defendants."

52. The Underwriters participated in drafting the Registration Statement, caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the IPO, and participated in the dissemination of the Registration Statement. However, the Underwriters failed to perform adequate due diligence in connection with their role as underwriters for the IPO and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately, free of misstatements or omissions.

53. In addition, the Underwriters met with potential investors and presented highly favorable but incorrect and/or misleading information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

54. Representatives of the Underwriters also assisted the Company and the Individual Defendants in planning the IPO. They also purported to conduct an adequate and reasonable

investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their due diligence, the Underwriters had access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

55. In addition to having access to internal corporate documents, the Underwriters and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (1) the strategy to best accomplish the Offering; (2) the terms of the Offering, including the price at which the Company's ADSs would be sold; (3) the language to be used in the Registration Statement; (4) what disclosures about the Company would be made in the Registration Statement; and (5) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those contacts and communications between the Underwriters' representatives and the Company's management and top executives, the Underwriters were, at a minimum, negligent in allowing dissemination of the material misstatements and omissions contained in the Registration Statement as detailed herein.

56. The Underwriters' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

## DEFENDANTS' WRONGDOING

### Tencent Music's Business and Its Antitrust Violations

57. In China, online music comprises over 90% of the entire recorded music market.[8] Tencent Music is the most formidable and largest player in that market.

[8] http://pdf.dfcfw.com/pdf/H3_AP201812041258794319_1.PDF

58. The Company operates the top four music mobile apps in China, i.e. QQ Music, Kugou Music, Kuwo Music and WeSing, and is the largest online music entertainment platform in China in terms of MAUs. According to the Registration Statement, Tencent Music attracted 800 million total unique MAUs every quarter since 2017. This means that over 60% of the 1.3 billion Chinese population used Tencent Music's platform every month.

59. 29.2% of its revenues in 2018 (U.S. $805 million) were generated from online music services, including subscription, paid on-demand, content sublicensing to its competing online music platforms and advertising. 70.8% of its revenues in 2018 (U.S. $1.9 billion), were generated from social entertainment services from sales of virtual gifts and memberships through online karaoke and live streaming services. Tencent Music dominates the Chinese online music entertainment market as it has over 83% market share and the largest music library in China of approximately 30 million tracks.

60. Tencent Music's rise and dominance in China came at a time when the Chinese government took the sternest measures in its history to crack down on online music piracy and violations in order to protect legitimate copyrights.

61. Before 2011, music piracy was rampant in China. 99% of the music content on the Chinese market was pirated[9] and readily accessible on all online music platforms. In 2012, the Chinese central government started to take actions to protect copyright, including contemplating amending the Copyright Law to broaden the scope of copyright protection.

62. In 2015, the Chinese central government issued a series of regulations and statutory amendments in the copyright area to heighten copyright protection, particularly in the digital music

[9] http://www.tourongji.com/6330.html

world.[10] Among those new regulations, the "Circular regarding Ceasing Transmitting Unauthorized Music Products by Online Music Service Providers" issued by the National Copyright Administration, ordered that all unauthorized music on the platforms of online music services providers be removed prior to July 31, 2015. This forced the major online music platforms in China to erase all pirated music tracks from their platforms virtually overnight.

63. Without an unlimited supply of unauthorized music content, major online music platforms in China, such as Tencent Music, NetEase Cloud, and Alibaba, competed for exclusive licenses, seeking as many music tracks as possible to attract and retain online music service customers for their platforms and squeeze out competitors. Relying on the strong financial support of its parent company, the global tech giant Defendant Tencent Holdings, Tencent Music partnered with over 200 music labels and obtained the publishing rights to over 90% of the music content in the Chinese market.[11] Most notably, Tencent Music secured 5 million tracks through exclusive licensing agreements with many music labels worldwide,[12] including the "Big Three" global record labels (i.e. Universal Music, Sony Music and Warner Music), and the most popular Chinese artists.

64. The International Federation of the Phonographic Industry report that the "Big Three" together hold the publishing rights to 89.1% of the entire world's music tracks, including almost all best-selling artists in world history, and accounting for 68.6% of the $19.1 billion global copyright revenues in 2018.[13]. For example, Universal Music owns the publishing rights to such best-selling artists as The Beatles, Rihanna, U2, Taylor Swift, Lady Gaga, and Queen; Sony Music

---

[10] http://xqdoc.imedao.com/1651f11f865166683fe18c1b.pdf
[11] http://pdf.dfcfw.com/pdf/H3_AP201812041258794319_1.PDF
[12] https://m.21jingji.com/article/20190917/herald/5e59f338181af05f689aff288885fc07.html
[13] https://wwww.huxiu.com/article/325804.html

owns the rights to Yo-Yo Ma, Michael Jackson, Céline Dion, Mariah Carey, Whitney Houston, and Beyoncé; and Warner Music has Ed Sheeran, Coldplay, and Bruno Mars.

65. Tencent Music also has the most diversified Chinese language music sources, through exclusive licensing from a variety of music labels and most popular reality television singing competitions, including JVR Music, Huayi Brothers, Li Yuchun Studio, and the Voice of China.[14]

66. Exclusive licensing has brought significant financial benefits to Tencent Music's business and operations.

67. First, by making as many music records as possible exclusively available on its platform, Tencent Music forced Chinese online music listeners to purchase Tencent Music's products and services, which increased the Company's subscription and on-demand downloading revenues and choked its competitors' growth. Take as an example the exclusive licensing agreement between Tencent Music and Jay Chou, the most popular and best-selling Chinese singer: when Tencent Music snatched the exclusive publishing rights to all of Jay Chou's music from its competitor NetEase Cloud in April 2018, 15% of NetEase Cloud users ended their subscriptions at NetEase Cloud and moved to Tencent Music.[15] On September 16, 2019, Tencent Music exclusively released Jay Chou's new song "Won't Cry". In 16 hours, nearly 7 million people purchased the track from the Tencent Music platform.[16] The sale of the song on Tencent Music's platform exceeded over RMB 28 million in one day.[17] This event contributed to the increase of the number of paying users on Tencent Music platform in the third quarter of 2019 by 42.2% to

---

[14] http://xqdoc.imedao.com/1651f11f865166683fe18c1b.pdf
[15] https://zhuanlan.zhihu.com/p/84773428
[16] https://m.21jingji.com/article/20190917/herald/5e59f338181af05f689aff288885fc07.html
[17] http://stock.eastmoney.com/a/201910091255545318.html

35.4 million year over year, and online music subscription revenue by 48.3% year-over-year to U.S. $132 million.[18] On the day of the track's release and the day after, Tencent Music's stock price went up by 1.24% and 1.29%. Maintaining a huge database with exclusive rights to music tracks was critical to Tencent's success, as this helped attract more customers and increased the likelihood that it would be the owner of the most popular and profitable music tracks.

68. Second, Tencent earned significant fees by sublicensing its exclusively owned tracks to its competitors at a high premium. It is estimated that the 40,000 to 50,000 most played tracks account for roughly 0.1% of all music played in China.[19] The Big Three own most of them, which means that NetEase had to sublicense all these songs from Tencent Music to maintain its platform's attractiveness.[20] As reported by Bloomberg, licensing songs from Tencent Music for use in China can be twice as expensive compared to when licensing directly from major labels for the rest of the world.[21] A civil judgment issued by the People's Court of Shenzhen Qianhai District[22] reveals that Tencent Music doubled the sublicensing fee of the same 808 songs of JVR Studio to NetEase Cloud in a year from RMB 8.7 million in 2016 to RMB 18.2 million in 2017.

69. Third, exclusive ownership of the music publishing rights on its platform also brought increased traffic to Tencent Music's social entertainment services, which account for over 70% of its revenues. For example, Jay Chou's song "Won't Cry" led to the production of over 12 million karaoke sponsored recordings based on this song by users on Tencent Music's karaoke app

---

[18] http://finance.eastmoney.com/a/201911131289666131.html
[19] https://www.pingwest.com/a/131599
[20] *Id.*
[21] https://www.bloomberg.com/news/articles/2019-08-27/watchdog-probes-tencent-s-grip-on-china-s-giant-music-industry
[22] The judgment is attached hereto as Exhibit 2.

WeSing within just 10 days of its release, generating extensive traffic and purchases of virtual gifts from Tencent Music's platform.[23]

70. Seeing the significant profits that exclusive licensing brought to its business, Tencent Music aggressively protected its exclusivity against other platforms, particularly its largest competitor NetEase Cloud, which craved a larger share of the online music market Tencent Music dominated. Yet in August 2017, Tencent Music refused to continue sublicensing to NetEase Cloud approximately 100,000 of the best-selling and most profitable songs. Although NetEase Cloud claimed that the tracks removed from its platform due to the discontinued sublicensing accounted for merely 1% of its entire library, such removal, in fact, had caused the majority of NetEase Cloud users to lose access to some songs saved on their playlists and forced NetEase Cloud users to install and use Tencent Music's platform to access those tracks.[24] At the same time, Tencent Music also filed two lawsuits against NetEase for publishing over 200 tracks of popular artists without its authorization.[25]

71. The disputes between China's two largest online music platforms and particularly Tencent Music's monopolistic misconduct drew the attention of the Chinese central government. On September 12, 2017, the National Copyright Administration summoned principal executives from Tencent Music and issued the September 2017 Order to Tencent Music, demanding that that Tencent Music stop the practice of exclusive licensing. The National Copyright Administration also invited other music service companies such as NetEase Cloud, Tencent Music and Baidu Taihe to the meeting to observe the discipline. The September 2017 Order specifically required that "[online music providers] shall purchase music copyrights in compliance with … market

[23] https://new.qq.com/omn/20191112/20191112A0G2VG00.html?pc
[24] https://www.pingwest.com/a/154937, attached hereto as Exhibit 3.
[25] https://www.pingwest.com/a/131599

laws … and shall … avoid purchasing exclusive copyrights", "shall … eliminate the illegal or unreasonable obstacles that are hindering expansive licensing and distributing of online music," and "shall not engage in collective management of music copyrights in any form."[26]

72. The September 2017 Order was specifically targeted at Tencent Music and resulted from complaints filed by Tencent Music's competitor NetEase.

73. Plaintiffs' Witness 1 ("Witness 1") was a bureau director of the National Copyright Administration, who participated in the National Copyright Administration's September 2017 intervention and related experts' deliberations. He has personal knowledge of the conflict between Tencent Music and its competitors over exclusive licensing issues. Witness 1 states that the government's September 2017 Order to online music platforms forbidding them from engaging in exclusive licensing agreements, issued at the September 2017 meeting, resulted from the intensification of the fight between Tencent Music with its competitor NetEase. The September 2017 Order plainly resolved the dispute *in favor of* NetEase and *against* Tencent Music, because it was Tencent Music that was engaging in monopolistic practices. Witness 1 confirms that notwithstanding the PRC government's directive, Tencent continued to withhold licensing of 1% of its music playlist from its competitors, which were the best and most in demand tracks. According to Witness 1, this tactic was highly anti-competitive. Witness 1 reports that NetEase Cloud then complained to the Chinese central government, which led to the NDRC and SAIC investigations. Witness 1 confirms that the NDRC anti-monopoly investigation of Tencent Music continued through all of 2018.

74. Under pressure from the Chinese government to stop its exclusive licensing practices, on the same day the National Copyright Administration issued its September 2017 Order

[26] See Exhibit 1.

to Tencent Music to cease its anti-competitive practices, on September 12, 2017, Tencent Music and Alibaba reached a sublicensing agreement. Four months later, in February of 2018, Tencent opened 99% of its music library to its largest competitor NetEase Cloud.

75. Despite the Chinese government's order to cease exclusive licensing, Tencent Music still withheld 1% of its music catalog from licensing by NetEase Cloud. The 1% included tracks from some of the best-selling artists in China, such as Zhang Yixing, Lu Han and Wang Yuan, and was the key source of Tencent Music's competitive advantage over NetEase Cloud.[27]

76. This 1% of tracks are critical to Tencent Music's business. In a December 22, 2018 Chinese-language report titled "*Music Industry In-depth Analyst Report – Exclusive Licensing Attracts Users; Direct Contracting with Musicians Controls Music Labels' Premium*,"[28] a Huachuang Securities Co., Ltd. analyst wrote that "[w]ith the intervention by the Nation [at the September 12, 2017 meeting], Tencent Music sublicensed 99%. The remaining 1% is the core resource for building distinctive products." In a section titled "User Procurement: Exclusive Contents Attract Users; 1% Exclusive Licensing + Original Music Build the Traffic Moat," the analyst continued that "[b]ased on our data analysis, the exclusivity as to this 1% most popular tracks [] was able to give Tencent Music 55% of its traffic and formed a content moat which enable it to procure 800 million users." The analyst concluded that "the 1% core tracks are enough for Tencent Music to build a competition barrier. Tencent Music still leads in the copyright area, far ahead of other platforms." This 1% of its music tracks "were the key to keep Tencent Music's target users."[29]

---

[27] See Exhibit 3.
[28] http://pdf.dfcfw.com/pdf/H3_AP201812241279056778_1.pdf, last viewed on April 22, 2021.
[29] See Exhibit 3.

77. Also, withholding these best-selling tracks from NetEase caused the majority of the NetEase users to have no access to songs saved in their playlists.[30] Only one month after Tencent Music had agreed to license 99% of its music content, it suddenly discontinued the renewal of the No. 1 best-selling artist Jay Chou sublicense to NetEase Cloud. The move came the night before the end of the existing sublicensing agreement. Tencent Music then filed a lawsuit against NetEase Cloud for its unauthorized use of Jay Chou's music for 7 hours.[31]

78. Tencent Music's monopolistic practices severely impeded competition among online music platforms and prevented development of the Chinese online music market.

79. According to a Weiwenku August 30, 2019,[32] NDRC initiated an investigation of Tencent Music's exclusive licensing practices at the end of 2017.

80. Immediately after the NDRC investigation, SAIC also launched its antitrust investigation of Tencent Music and sent a questionnaire to the Company at approximately the end of 2017 or the beginning of 2018 according to a PaRR April 25, 2018 memo attached hereto as Exhibit 5 ("PaRR Memo").[33] The PaRR Memo quoted a source as saying that "[i]t is very rare for a company to be investigated by two agencies simultaneously". The PaRR Memo reported that upon its formation of SAMR as an executive agency on April 10, 2018, SAMR took over antitrust enforcement responsibilities from SAIC and NDRC and continued and consolidated their investigations into Tencent Music. Witness 1 confirms that after China combined and consolidated the antitrust divisions of the Ministry of Commerce, NDRC, and SAIC into SAMR in 2019, SAMR

---

[30] *Id.*

[31] See Exhibit 2.

[32] https://www.weiwenku.org/d/201255312, article attached hereto as Exhibit 4.

[33] PaRR is a news and analysis service which primarily focuses on antitrust matters. Its Director of Sales, Americas told Plaintiffs' counsel that the PaRR Memo is not available to the public. It is a proprietary client memo available only to those who paid $15,000 for an annual subscription for PaRR Global Intelligence and Data service.

continued the formal anti-monopoly investigation of Tencent's music business. The PaRR Memo noted that PaRR had contacted Tencent Music for comment on the investigations.

81. Before the SAMR's formation, China's antimonopoly laws had been enforced by three separate authorities in their respective enforcement areas:

- NDRC brought enforcement actions against price-related violations.
- SAIC brought enforcement against non-price-related violations.
- the Ministry of Commerce ("MOFCOM") oversaw mergers.

82. Additionally, China State Council's Anti-Monopoly Commission ("Anti-Monopoly Commission") had exercised a policy-making role that supplemented the enforcement by MOFCOM, NDRC and SAIC and served as a quasi-supervisory function for antitrust enforcement by these authorities.

83. On March 13, 2018, China announced a massive overhaul to streamline its governance of businesses and commerce by merging, consolidating, reorganizing existing ministries and establishing various new ministries. As part of the overhaul, the Chinese government formed the SAMR, which became (among other things) the unified anti-monopoly enforcement agency in China. The SAIC and Anti-Monopoly Commission were merged into the SAMR, while the SAMR took over all anti-monopoly functions from MOFCOM and NDRC. Due to the extraordinary scale of the transfer of power among the various ministries, China set the end of 2018 as the date by which the ministries must complete the overhaul. On April 10, 2018, the SAMR officially hung up its sign at its offices, signaling that it was open for business.

84. After the Chinese central government completed the restructuring of its various ministries and merged all anti-monopoly enforcement responsibilities from various agencies into SAMR in 2018, SAMR expanded the investigation into Tencent Music to require assistance from

all major players in the industry in January 2019.[34] During the investigation, SAMR questioned top music labels Universal Music Group, Sony Music Group and Warner Music Group regarding the exclusive music licensing agreements they entered into with Tencent Music. More than 10 companies, including Apple, Tencent Music, Baidu, NetEase, Huawei, Xiaomi and ByteDance were summoned by the SAMR to assist with the investigation into Tencent Music's monopolistic practices.

85. The investigation could have a material impact on Tencent Music. As stock analysts covering Tencent Music reported during the Class Period:

- In a January 15, 2019 report, Morgan Stanley analysts wrote that "[w]e are bullish on streaming as a long-term growth driver for the global music industry. In China, [Tencent Music] offers solid exposure to this theme, ***considering its dominant 80% market share*** and favorable industry position amid fragmentation in music labels."
- In a January 17, 2019 report, J.P. Morgan analysts wrote that Tencent Music "has a rich content library of professional- and user-generated content [which] makes [Tencent Music] a go-to platform for music enthusiasts in China." The analysts highlighted the library as one of Tencent Music's key competitive advantages.
- In a May 13, 2019 report, China Renaissance analysts wrote that Tencent Music had more licensed tracks than its competitors, and that in particular, "for the top content, Tencent [Music] does have more offerings than competitors." The analyst then explained that because of this larger library for top content, "the majority of

---

[34] The SAMR was created when the PRC government restructured its key Ministries at the central governmental level in 2018, consolidating all anti-monopoly regulatory oversight and enforcement into the SAMR. See Exhibit 4.

[Tencent Music]'s users are exclusive users, which is different from competing platforms." This, the analyst explained, is one of Tencent Music's main competitive advantages.

86. After the end of the Class Period, stock analysts cited the investigation as a reason not to buy Tencent Music stock:

- In an October 14, 2019 report titled *3Q19 earnings preview: Business on track but regulation an overhang*, UBS analysts cautioned about the "**Lack of visibility on anti-trust investigation**. Since August, there has been news flow that [Tencent Music] is under investigation by the State Administration for Market Regulation (SAMR) due to anti-trust issues." Citing these concerns, the analysts cut their estimate of Tencent Music's stock price in 12 months from $16.20 to $15.20.
- In a November 4, 2019 report titled *3Q19 Preview: Steady Quarter amid Regulatory Uncertainty*, Morgan Stanley analysts forecast that Tencent Music's financial outlook would improve, but nonetheless recommended that investors "**Stay EW** ["equal weight", a middling rating] **on rich valuation amid regulatory uncertainty**," namely that "the recent anti-trust investigation (according to Bloomberg) poses regulatory uncertainty on existing master licensing agreements [] and sub-licensing agreements with other music platforms[.]"

**China Anti-Monopoly Law and Enforcement Proceedings**

87. According to Article 19 of the PRC Anti-Monopoly Law, effective since 2008,[35] "the conclusion that a company holds a dominant market position may be deduced from any one

---

35 http://english.mofcom.gov.cn/article/policyrelease/Businessregulations/201303/20130300045909.shtml. The official translation uses the term "undertaking" to refer to a company or business entity.

of the following circumstances: (1) the market share of one undertaking accounts for half of the total in a relevant market”. Tencent Music, with its 83.8% market share, holds a dominant market position in the Chinese online music market.

88. Article 17 of the Anti-Monopoly Law prohibits companies holding dominant market positions “from doing the following by abusing their dominant market positions:

> (1) selling products at unfairly high prices or buying products at unfairly low prices;
>
> …
>
> (4) without justifiable reasons, allowing their trading counterparts to make transactions exclusively with themselves or with the companies designated by them”.

89. Tencent Music sublicensed music tracks to its competitors at unfairly high prices with 100% markup. Furthermore, its exclusive agreements with the majority of music labels worldwide constituted violations of Article 17(4) of the Anti-Monopoly Law.

90. Article 47 of the Anti-Monopoly Law[36] subjects Tencent Music to have all of its profits confiscated, along with a penalty of up to 10% of its sales achieved in the previous year, in addition to forcing it to relinquish its exclusive copyrights. Tencent Music had exclusive licenses to over 5 million music tracks.

91. A Chinese government order directing Tencent Music to terminate its exclusive licensing arrangements or modify them to have less favorable terms would materially disrupt

[36] Article 47 provides “Where a company, in violation of the provisions of this Law, abuses its dominant market position, the authority for enforcement of the Anti-monopoly Law shall instruct it to discontinue such violation, confiscate its unlawful gains and, in addition, impose on it a fine of not less than one percent but not more than 10 percent of its sales achieved in the previous year.”

Tencent Music's operations. Tencent Music later admitted in its Registration Statement that termination or modification of exclusivity licensing to have less favorable terms could materially disrupt Tencent Music's operations.

92. The Anti-Monopoly Law and relevant regulations promulgated by NDRC, SAIC and SAMR do not make any distinction between preliminary/informal and formal investigations. Indeed, to launch ***any*** investigation, a governmental authority must first officially open a case, which can be done only after the authority knows of the suspected antitrust violations and obtains approval from the authority's principal.

93. As to the SAIC investigation, according to Article 18 of the *Provisions on the Procedures for Imposition of Administrative Punishments* by the Administrative Authorities for Industry and Commerce – rules promulgated by SAIC and effective from October 1, 2007 through April 1, 2019, applicable to all enforcement actions conducted by SAIC and its local agencies,[37] requires the SAIC to obtain advance approval from its principal to conduct any investigation. The principal her- or himself must designate at least two officials to conduct the investigation.

94. Articles 3 of the *Provisions on the Procedures for the Administrative Departments for Industry and Commerce to Investigate and Handle Cases of Monopolization Agreements and Abuse of Dominant Market Position*, promulgated by SAIC and effective from July 1, 2009 through September 1, 2019, provided that "SAIC shall be responsible for investigating and punishing the monopolistic conduct if (1) it has significant impact across the nation; or (2) SAIC deems it has jurisdiction."[38] Articles 9 and 10 of these Provisions require prior approval, before an

---

[37] SAMR continued to follow all SAIC rules until it gradually replaced them after SAMR's formation.

[38] Article 3 provides in full:

investigation, from the SAIC leader if it is a nationally significant violation, or a local AIC leader if it is a regional violation. These Articles also allow the central SAIC to conduct investigations on its own as to the cases it opens.

95. Similarly, as to the NDRC investigation, Article 6 of the *Provisions on the Administrative Procedures for Law Enforcement against Price-Fixing Monopoly*, promulgated by NDRC and effective from February 1, 2011 through September 1, 2019, requires that before taking any investigative measures, "it should submit a written report to the principal of the pricing bureau [i.e. NDRC and its local agencies] and obtain the principal's approval". Article 12 provided that if a pricing bureau found the existence of monopolistic pricing conduct after an investigation, the agency should issue a decision according to the law. Article 3 provided that NDRC shall be responsible for the law enforcement against price fixing across the nation.

96. As to the SAMR investigation, Article 17 of the *Interim Provisions on the Procedures for Imposition of Administrative Punishments by the Administration for Market Regulation* – promulgated by SAMR, effective from April 1, 2019, and applicable to all enforcement actions, requires the SAMR and any of its local agencies to secure the advance

---

The SAIC shall be responsible for investigating and punishing the monopolistic behaviors if: (1) they have significant impacts across the country; or (2) they are believed by the SAIC as falling with its jurisdiction.
A provincial administration for industry and commerce may be authorized to be responsible for investigating and punishing the monopolistic behaviors if: (1) they occur within its administrative region; (2) they occur across two or more provinces, autonomous regions, or municipalities directly under the Central Government, but the main place where the behavior occurs is within its administrative region; or (3) the SAIC believes that it may delegate jurisdiction to the provincial administration for industry and commerce.
The delegation shall be made on a case-by-case basis. No delegated provincial administration for industry and commerce shall re-delegate any administration for industry and commerce at a lower level.

approval of the SAMR's chief before conducting any investigation. The SAMR chief must also designate at least two officials to conduct the investigation.

97. The PRC Anti-Monopoly Law also contemplates only one type of investigation. *See* Article 38 "The anti-monopoly authority shall make investigations into suspicious monopolistic conducts in accordance with law". *See also* Article 44 "Where the anti-monopoly authority finds a monopolistic conduct after investigating and verifying a suspicious monopolistic conduct, it shall make a decision on how to deal with the monopolistic conduct, and publicize it."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### Tencent Music's IPO Registration Statement

98. On October 2, 2018, Tencent Music filed with the SEC the Registration Statement on Form F-1 for the sale of its ADS in connection with its planned IPO on the NYSE.

99. On December 10, 2018, Tencent Music filed the second and final amendment to the Registration Statement, which registered 82,000,000 Tencent Music ADSs for public sale.

100. The SEC declared the Registration Statement effective on December 11, 2018.

101. On or about December 12, 2018, Tencent Music priced the IPO at $13 per ADS and filed the final prospectus for the IPO on December 12, 2018, which forms part of the Registration Statement. That day, 82,000,000 Tencent Music ADSs were sold to investors for gross proceeds of U.S. 1.1 billion. The Company itself offered 41,029,829 ADSs for total proceeds to Tencent of $ 512,052,265.92 before expenses.

102. The Registration Statement was materially misleading because it failed to disclose that: (i) prior to and at the time of the IPO, the Chinese government was conducting an anti-monopoly investigation into Tencent Music's exclusive licensing practices; (ii) the investigation was likely to lead to severe restrictions and/or termination of Tencent Music's highly profitable

exclusive licensing arrangements; (iii) Tencent Music's financial performance was reasonably likely to be materially impacted as a consequence of terminating exclusive agreements with music labels and artists; and (vi) Tencent Music could be subject to material regulatory action leading to penalties and significant financial damages if the Chinese government determined that Tencent Music had violated the PRC Anti-Monopoly Law based on the on-going investigation.

103. The risk disclosures Tencent Music included in the Registration Statement were misleading because Defendants knew of the Chinese government's ongoing investigation of Tencent Music's monopolistic practices.

104. The Registration Statement stated that:

> "PRC laws and regulations concerning the online music entertainment industry are developing and evolving. Although we have taken measures to comply with the laws and regulations that are applicable to our business operations and avoid conducting any non-compliant activities under the applicable laws and regulations, the PRC governmental authorities may promulgate new laws and regulations regulating the online music industry in the future. We cannot assure you that our practice would not be deemed to violate any new PRC laws or regulations relating to online music streaming. Moreover, developments in the online music entertainment industry may lead to changes in PRC laws, regulations and policies or in the interpretation and application of existing laws, regulations and policies that may limit or restrict online reading marketplaces like us, which could materially and adversely affect our business and operations."

105. This statement was itself materially misleading because it implied that there was no present or imminent threat that the Chinese government would impose regulatory penalties on Tencent Music, when in fact Defendants knew that, at the time of the IPO, Tencent Music was violating "the applicable laws and regulations" and the Chinese government was then conducting an on-going investigation into Tencent Music's monopolistic practice which could impose significant fines and penalties on its business, as well as diminish revenue from transactions that violate anti-monopoly laws.

106. The Registration Statement stated that:

> "PRC laws and regulations are evolving, and there are uncertainties relating to the regulation of different aspects of the online music entertainment industry, including but not limited to exclusive licensing and sublicensing arrangements. Pursuant to an article posted on National Copyright Administration's official website, in September 2017, the National Copyright Administration held meetings with a number of music industry players, including us, where it encouraged the relevant industry players to 'avoid acquiring exclusive music copyright' and indicated that they should also not engage in activities involving 'collective management of music copyright.' There is substantial uncertainty as to whether some of our current licensing arrangements may be found objectionable by the regulatory authorities in the future."

107. This statement was materially misleading and incomplete because it implied that there was no present or imminent threat that the Chinese government would impose regulatory penalties on Tencent Music, when in fact Defendants knew that, at the time of the IPO, the Chinese government was conducting an investigation into Tencent Music's monopolistic practice which could impose significant fines and penalties on its business, as well as diminish revenue from transactions that violate anti-monopoly laws. Moreover, Tencent misleadingly stated that the Chinese government merely encouraged it not to enter into exclusive licensing arrangements, when in truth, the Chinese government issued the September 2017 Order to *Tencent Music* that it "***shall*** purchase music copyrights in compliance with … market laws … and ***shall*** … avoid purchasing exclusive copyrights", "***shall*** … eliminate the illegal or unreasonable obstacles that are hindering expansive licensing and distributing of online music, and "***shall*** not engage in collective management of music copyrights in any form". Further, the statement misleadingly characterized the September 2017 meeting as a mere policy get-together to which it was invited, though in truth the meeting's purpose was to resolve an ongoing dispute between NetEase and Tencent Music by ordering Tencent Music to stop engaging in ongoing monopolistic practices central to its business.

108. Tencent Music's statement that "[t]here is substantial uncertainty as to whether some of our current licensing arrangements may be found objectionable by the regulatory

authorities in the future" was false and misleading because PRC regulators had already told Tencent that its exclusive licensing arrangements were illegal and that Tencent must cease those practices, or it would be held accountable by the regulators for the misconduct.

109. In the Underwriter Agreement attached to and incorporated into Tencent Music's Registration Statement as Exhibit 1.1[39], Defendants represented that:

> ***There are no*** legal, arbitration or ***governmental proceedings (including, without limitation, governmental investigations or inquiries***) pending to which the Company or any of its Subsidiaries or the Company's directors and executive officers is a party or of which any property of the Company or any of its Subsidiaries is the subject ***which, if determined adversely to the Company or any of its Subsidiaries, would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect[40]; and to the best of the Company's knowledge, no such proceedings are threatened or contemplated by governmental authorities or threatened by others.***

110. These statements were false because at the time of the IPO, Tencent Music knew that the SAMR was investigating its core business practices and that such investigation could lead to a material adverse effect if resolved against Tencent Music.

**SEC Regulation S-K Required Tencent Music to Disclose Known Trends and Uncertainties in The Registration Statement.**

*Item 303 demands disclosure*

111. SEC Regulation S-K (27 CFR 229.10) provides that registration statements such as the one filed by Tencent Music on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." 17 C.F.R. 229.10. Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

---

[39] https://www.sec.gov/Archives/edgar/data/1744676/000119312518340313/d624633dex11.htm
[40] Underwriter Agreement defines "Material Adverse Effect" as a material adverse effect on the general affairs, management, financial position, shareholders' equity, results of operations or prospects of the Company and its Subsidiaries taken as a whole.

112. Part I, Item 5(d) Form 20-F, in turn, requires registrants to:

> [D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

113. Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K". *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 n.1.

114. Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). In a 1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[41]

115. Item 5(d) requires disclosure based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects." *Id.* at *4.

---

[41] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

116. Item 303 demands disclosure of known trends unless management determines that a material effect on financial condition or results of operations is not likely to appear. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) or Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.
> 1989 Interpretive Release, 1989 WL 1092885, at *6

117. Issuers must disclose regulatory actual or contemplated regulatory action, as shown by an example provided by the 1989 Interpretive Release:

> Facts: A registrant has been correctly designated a PRP by the EPA with respect to cleanup of hazardous waste at three sites. No statutory defenses are available. The registrant is in the process of preliminary investigations of the sites to determine the nature of its potential liability and the amount of remedial costs necessary to clean up the sites. Other PRPs also have been designated, but the ability to obtain contribution is unclear, as is the extent of insurance coverage, if any. Management is unable to determine that a material effect on future financial condition or results of operations is not reasonably likely to occur.
>
> Based upon the facts of this hypothetical case, MD&A disclosure of the effects of the PRP status, quantified to the extent reasonably practicable, would be required. [Footnote omitted]. For MD&A purposes, aggregate potential cleanup costs must be considered in light of the joint and several liability to which a PRP is subject. Facts regarding whether insurance coverage may be contested, and whether and to what extent potential sources of contribution or indemnification constitute reliable sources of recovery may be factored into the determination of whether a material future effect is not reasonably likely to occur.
>
> *Id.* at *6.

118. Issuers must disclose both (a) known trends and uncertainties and (b) any potential material impact of known trends and uncertainties on their own operations even if the trends are a

matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6. *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

119. Indeed, as a foreign issuer, Tencent Music faces heightened obligations to disclose government action. Item 303 specifically instructs foreign private registrants like Tencent Music to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals." 17 C.F.R. § 229.303, ¶12. There is no corresponding specific requirement for domestic companies.

120. The Chinese government initiated its anti-monopoly investigation of Tencent Music prior to Tencent Music's U.S. IPO. Under the Chinese anti-monopoly Law, such investigation into Tencent Music's anti-competitive practices could subject it to material punishments and significantly disrupt its operations. Furthermore, despite the Chinese government's directive to principal executives of Tencent Music in 2017 prohibiting exclusive licensing agreements, Tencent Music continued with the practice. Tencent Music's anti-competitive practices increased the risk that the Chinese government would find it was violating anti-monopoly law and impose severe punishments. Tencent Music admitted that termination of any existing licensing agreements or the renewal of license agreements on less favorable terms, could have a material adverse effect on its business, financial condition and results of operations. Therefore, under Item 5(d), Tencent Music was required to disclose the on-going investigation.

*<u>Item 503 demands disclosure</u>*

121. Item 503 requires disclosure and discussion of, among other things, "the most significant factors that make the offering risky or speculative."

122. In violation of Item 503, the Registration Statement omitted to disclose the on-going anti-monopoly investigation which, as discussed above, could have material adverse effects on Tencent Music' business.

**Post-IPO Materially False and Misleading Statements**

123. On April 19, 2019, the Company filed an annual report on Form 20-F with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2018 (the "2018 20-F"). Defendant Pang signed the 2018 20-F. The Exchange Act Individual Defendants certified the 2014 20-F's accuracy pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX").

124. The 2018 20-F stated that

> "We depend upon third-party licenses for the content of our music offerings, and any adverse changes to, or loss of, our relationships with these music content providers may materially and adversely affect our business, operating results, and financial condition."
> "PRC laws and regulations are evolving, and there are uncertainties relating to the regulation of different aspects of the online music entertainment industry, including but not limited to exclusive licensing and sublicensing arrangements. Pursuant to an article posted on National Copyright Administration's official website, in September 2017, the National Copyright Administration held meetings with a number of music industry players, including us, where it encouraged the relevant industry players to 'avoid acquiring exclusive music copyright' and indicated that they should also not engage in activities involving 'collective management of music copyright.' There is substantial uncertainty as to whether some of our current licensing arrangements may be found objectionable by the regulatory authorities in the future."

125. These statements were materially misleading and incomplete because Tencent and the Exchange Act Individual Defendants failed to disclose that the Chinese government was conducting an ongoing investigation into Tencent Music's monopolistic practices which could impose significant fines and penalties on its business, as well as diminish revenue from transactions that violate anti-monopoly laws. Moreover, Tencent misleadingly stated that the

Chinese government merely encouraged it not to enter into exclusive licensing arrangements, when in truth, the Chinese government issued the September 2017 Order to Tencent Music that it "***shall*** purchase music copyrights in compliance with … market laws … and ***shall*** … avoid purchasing exclusive copyrights", "***shall*** … eliminate the illegal or unreasonable obstacles that are hindering expansive licensing and distributing of online music, and "***shall*** not engage in collective management of music copyrights in any form".

**THE TRUTH MATERIALIZES CAUSING PLAINTIFFS' LOSSES**

126. On August 14, 2019, Red Pulse reported that the Chinese government was conducting an anti-monopoly investigation of Tencent Music because of its exclusive licenses with Universal Music, Sony Music, and Warner Music. On this news, the price of Tencent Music ADS dropped 5.36% or $0.78 per ADS, on a high volume of nearly 8 million shares traded.

127. On August 27, 2019, a Bloomberg news article further elaborated on Tencent Music antitrust violations, including that Tencent Music was charging unfairly high prices for its music. This caused the price of Tencent Music ADS to further drop 6.82% or $0.92 per ADS, on a high volume of over 12 million shares traded.

128. The two declines caused by news of the antitrust investigation collectively erased approximately $187 million in shareholder value.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

129. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities that purchased or otherwise acquired Tencent ADSs pursuant and/or traceable to the Registration Statement issued in connection with Tencent Music December 12, 2018 IPO and during the Class Period.

130. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tencent Music or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

131. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

132. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

133. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the federal securities laws;

b) whether the Registration Statement omitted and/or misrepresented material facts about the Company's business, operations, and prospects; and

c) to what extent the members of the Class have sustained damages and the proper measure of damages.

134. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SECURITIES ACT CLAIMS

### COUNT I
### Violations of Section 11 of the Securities Act
### Against All Defendants, Except Tencent Holdings Limited

135. Plaintiffs repeat and re-allege the allegations set forth in ¶¶ 1-122, 129-134 as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

136. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except Tencent Holdings Limited.

137. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

138. The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the Registration Statement; and/or were directors, underwriters or selling stockholders who are appropriate defendants in this Count.

139. Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

140. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

141. The Underwriters owed to the holders of the ADSs acquired through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such

statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

142. Plaintiffs acquired Tencent Music ADSs pursuant to the Registration Statement.

143. At the time of their purchases of Tencent Music ADSs, Plaintiffs and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

144. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**COUNT II**
**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants and Tencent Holdings Limited**

145. Plaintiffs repeat and re-allege the allegations set forth in ¶¶ 1-122, 129-144, as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

146. This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants and Tencent Holdings Limited, each of whom was a control person of Tencent Music during the relevant period.

147. The Individual Defendants and Tencent Holdings Limited were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement.

148. None of the Individual Defendants and Tencent Holdings Limited made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised

reasonable care, they would have known of the material misstatements and omissions alleged herein.

149. Plaintiffs and the Class have sustained damages. The value of Tencent Music ADSs has declined substantially due to the Securities Act violations alleged herein.

150. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

## EXCHANGE ACT CLAIMS

### COUNT III
### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against Tencent Music and Exchange Act Individual Defendants

151. Plaintiffs repeat and re-allege the allegations set forth in ¶¶ 1-134, as if fully set forth herein. This Count is asserted against Tencent Music and Exchange Act Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 promulgated thereunder by the SEC.

152. Tencent Music is liable for the acts of the Exchange Act Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

153. The scienter of the Exchange Act Individual Defendants and other employees and agents of the Company is similarly imputed to Tencent Music under *respondeat superior* and agency principles.

### Applicability of Presumption of Reliance: *Affiliated Ute*

154. The statements made by Tencent and the Exchange Act Individual Defendants during the Class Period were misleading for omitting to disclose information concerning the on-going investigation which rendered statements in the Registration Statement and 2018 20-F misleading.

155. Neither plaintiffs nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which primarily are based on omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is necessary is that the facts that Tencent Music withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**Application of Presumption of Reliance:**
**Fraud on the Market**

156. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Tencent Music and the Exchange Act Individual Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) Tencent Music securities were traded in efficient markets during the Class Period.

157. Tencent Music's securities traded in efficient markets during the Class Period for the following reasons: (i) the securities were traded on NYSE; (ii) on average shares representing more than 2.0% of the securities' float were traded weekly during the Class Period; (iii) During

the Class Period, Tencent Music was followed by numerous securities analysts employed by major brokerage firms, including Morgan Stanley, Stifel, Deutsche Bank, Credit Suisse, etc., who wrote reports that were widely distributed and publicly available; (iv) Tencent Music met the criteria for eligibility to file an S-3 Registration Statement during the Class Period; (v) Tencent Music timely filed all required annual, quarterly and material event reports with the SEC during the Class Period; (vi) Tencent Music regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (vii) the price of Tencent Music securities responded quickly to incorporate and reflect new public information concerning Tencent Music during the Class Period; (viii) more than ten market makers made a market in Tencent Music ADSs during the Class Period.

158. During the Class Period, Tencent Music and Exchange Act Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tencent Music securities; and (iii) cause Plaintiffs and other members of the Class to purchase Tencent Music securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, Tencent Music and Exchange Act Individual Defendants, and each of them, took the actions set forth herein.

159. Pursuant to the above plan, scheme, conspiracy and course of conduct, Tencent Music and each of the Exchange Act Individual Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tencent Music securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tencent Music's finances and business prospects.

160. By virtue of their positions at Tencent Music, Tencent Music and Exchange Act Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Tencent Music and Exchange Act Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Tencent Music and Exchange Act Individual Defendants. Said acts and omissions of Tencent Music and Exchange Act Individual Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

161. Information showing that Tencent Music and Exchange Act Individual Defendants acted knowingly or with reckless disregard or the truth is peculiarly within the knowledge and control of Tencent Music and Exchange Act Individual Defendants. As the senior managers and/or

directors of Tencent Music, the Exchange Act Individual Defendants had knowledge of the details of Tencent Music internal affairs.

162. The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Tencent Music. As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Tencent Music's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market prices of Tencent Music securities were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Tencent Music's business and financial condition which were concealed by Tencent Music and Exchange Act Individual Defendants, Plaintiffs and the other members of the Class purchased Tencent Music securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Tencent Music and Exchange Act Individual Defendants, and were damaged thereby.

163. During the Class Period, Tencent Music ADSs were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased Tencent Music securities at prices artificially inflated by the wrongful conduct of Tencent Music and Exchange Act Individual Defendants. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were

paid. At the time of the purchases by Plaintiffs and the Class, the true value of Tencent Music securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Tencent Music securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

164. By reason of the conduct alleged herein, Tencent Music and Exchange Act Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

165. As a direct and proximate result of the wrongful conduct of Tencent Music and Exchange Act Individual Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

166. This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

**COUNT IV**
**For Violations of §20(a) of the Exchange Act**
**Against Exchange Act Individual Defendants and Tencent Holdings Limited**

167. Plaintiffs repeat and re-allege the allegations set forth in ¶¶ 1-134, 151-166, as if fully set forth herein.

168. During the Class Period, the Exchange Act Individual Defendants and Tencent Holdings Limited participated in the operation and management of Tencent Music, and conducted and participated, directly and indirectly, in the conduct of Tencent Music's business affairs. Because of their senior and controlling positions, they knew the adverse non-public information about Tencent Music, and the regulatory risks and issues raised by the SAIC.

169. As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tencent Music's financial condition and results of operations, and to correct promptly any public statements issued by Tencent Music's which had become materially false or misleading.

170. Because of their positions of control and authority as senior officers and/or controlling shareholders, the Exchange Act Individual Defendants and Tencent Holdings Limited were able to, and did, control the contents of the various reports, press releases and public filings which Tencent Music disseminated in the marketplace during the Class Period concerning Tencent Music's results of operations. Throughout the Class Period, the Exchange Act Individual Defendants and Tencent Holdings Limited exercised their power and authority to cause Tencent Music to engage in the wrongful acts complained of herein. The Exchange Act Individual Defendants and Tencent Holdings Limited therefore, were "controlling persons" of Tencent Music within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tencent Music securities.

171. Each of the Exchange Act Individual Defendants and Tencent Holdings Limited, therefore, acted as a controlling person of Tencent Music. By reason of their senior management positions, being directors, and/or controlling shareholders of Tencent Music, each of the Exchange Act Individual Defendants and Tencent Holdings Limited had the power to direct the actions of, and exercised the same to cause, Tencent Music to engage in the unlawful acts and conduct complained of herein. Each of the Exchange Act Individual Defendants and Tencent Holdings Limited exercised control over the general operations of Tencent Music and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

172. By reason of the above conduct, the Exchange Act Individual Defendants and Tencent Holdings Limited are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tencent Music.

173. This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

## PRAYER FOR RELIEF

A. Determining that the instant action may be considered a class action under Rule 23 or the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B. Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post judgment interest; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: January 10, 2022

THE ROSEN LAW FIRM P.A.

/s/ Phillip Kim

Phillip Kim
Laurence Rosen
Jing Chen
Jonathan Horne
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com
jchen@rosenlegal.com
jhorne@rosenlegal.com
*Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of January 2022, a true and correct copy of the foregoing SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Phillip Kim