UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

THERESA GORDON, individually and on behalf
of all others similarly situated,

Plaintiff,

v.

TENCENT MUSIC ENTERTAINMENT GROUP,
TENCENT HOLDINGS LIMITED, CUSSION
KAR SHUN PANG, MIN HU, TONG TAO
SANG, ZHENYU XIE, GUOMIN XIE, MARTIN
CHI PING LAU, BRENT RICHARD IRVIN,
TAK-WAI WONG, LIANG TANG, HAIFENG
LIN, MORGAN STANLEY & CO. LLC,
GOLDMAN SACHS (ASIA) L.L.C., J.P.
MORGAN SECURITIES LLC, DEUTSCHE
BANK SECURITIES INC., MERRILL LYNCH ,
PIERCE, FENNER & SMITH INCORPORATED,
CREDIT SUISSE SECURITIES (USA) LLC,
CHINA INTERNATIONAL CAPITAL
CORPORATION HONG KONG SECURITIES
LIMITED, ALLEN & COMPANY LLC, BOCI
ASIA LIMITED, CHINA RENAISSANCE
SECURITIES (HONG KONG) LIMITED, HSBC
SECURITIES (USA) INC., KEYBANC CAPITAL
MARKETS INC., STIFEL NICOLAUS &
COMPANY, INCORPORATED,

Defendants.

**MEMORANDUM AND ORDER**
19-CV-5465 (LDH) (TAM)

---

LASHANN DEARCY HALL, United States District Judge:

Theresa Gordon ("Plaintiff"), individually and on behalf of all others similarly situated,

asserts claims against Tencent Music Entertainment Group ("TME"), Morgan Stanley & Co.

LLC, J.P. Morgan Securities LLC, Deutsche Bank Securities Inc., Merrill Lynch, Pierce, Fenner

& Smith Incorporated, Credit Suisse Securities (USA) LLC, Allen & Company LLC, HSBC

Securities (USA) Inc., KeyBanc Capital Markets Inc., Stifel, Nicolaus & Company, Inc., Cussion

Kar Shun Pang, Min Hu, Tong Tao Sang, Zhenyu Xie, Guomin Xie, Martin Chi Ping Lau, Brent Richard Irvin, Tak-Wai Wong, Liang Tang, and Haifeng Lin (collectively, with TME, "Defendants"),  pursuant to the Securities Act for violations of §§ 11 and 15, and the Securities Exchange Act for violations of §§ 10(b) and 20(a).  Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss to dismiss the complaint in its entirety.

**BACKGROUND[1]**

TME is a music entertainment platform in China, providing online music, online karaoke, and music-centric live streaming services.  (Second Amended Complaint ("SAC") ¶ 2, ECF No. 116.)  TME operates the top four music mobile apps in China.  (*Id.* ¶ 58.)  To provide content to its users, TME maintained exclusive licensing agreements with music labels worldwide, and obtained the publishing rights to over 90% of the music content in the Chinese market.  (*Id.* ¶¶ 3, 63.)  Exclusive ownership of publishing rights was a major aspect of TME's success in the Chinese market and TME aggressively protected its exclusivity against other platforms.  (*Id.* ¶¶ 66–69.)

According to the SAC, TME and NetEase Cloud (another online music platform company) had been disputing TME's refusal to sublicense certain of its copyrights.  (*Id.* ¶ 70.)  Sometime thereafter, on September 12, 2017, Plaintiff alleges that the National Copyright Administration of China ("NCA") "summoned principal executives from [TME]" to a meeting, and "invited" other music service companies, such as NetEase Cloud and Baidu Taihe, to "observe the discipline."  (*Id.* ¶ 71.)  That is, at the meeting, NCA issued an order (the

---

[1] The following facts taken from the second amended complaint (ECF No. 116) are assumed true for the purpose of this memorandum and order.  These facts are largely the same as those contained in the first amended complaint ("FAC"), and familiarity is presumed.  (*See* Mem. & Order, *Gordon v. Tencent Music Ent. Grp.*, 19-CV-5465, 2021 WL 9183821 (E.D.N.Y. Mar. 31, 2021) (*"Gordon I"*), ECF No. 108.)  For the purpose of this memorandum and order, the Court focuses primarily upon the new allegations concerning TME's alleged monopolistic conduct and the Chinese Government's response.

2

"September 2017 Order") demanding that TME stop the practice of exclusive licensing.  (*Id.*)
Among other things, the September 2017 Order required that online music providers "shall
purchase music copyrights in compliance with . . . market laws . . . and shall . . . avoid
purchasing exclusive copyrights, shall . . . eliminate the illegal or unreasonable obstacles that are
hindering expansive licensing and distributing of online music, and shall not engage in collective
management of music copyrights in any form."  (*Id.*)  Plaintiff alleges that the September 2017
Order was specifically targeted at TME.  (*Id.* ¶ 72.)  According to Plaintiff's Witness 1, a bureau
director of the NCA and a participant "in the . . . intervention," the September 2017 Order
"resulted from the intensification of the fight between [TME] with its competitor NetEase."  (*Id.*
¶ 73.)  And, the NCA "plainly resolved the dispute . . . *against* [TME], because it was [TME]
that was engaging in monopolistic practices."  (*Id.* (emphasis in original).)

Sometime after the meeting, the NCA issued a statement.  (*See* Ex. 1 ("NCA Statement"),
SAC, ECF No. 116-1.)  The NCA Statement summarizes the September 2017 meeting as
follows:  "On September 12, [NCA] interviewed the principal executives of [TME], AliMusic,
NetEase Cloud Music, and Baidu Taihe Music for the online music copyrights."  (*Id.*)  The NCA
director "pointed out that since the [NCA] organized to regulate the special rectification of the
online music copyright order in 2015, the online music service providers have actively supported
and cooperated with the [NCA] by proactively taking more than 2.2 million unauthorized music
works offline, and jointly signing the 'Declaration on Self-discipline of Online Music Copyright
Protection.'"  (*Id.*)  Still, the NCA director "emphasized" that "every online music service
provider shall perform the main responsibilities in accordance with the requirements of the
copyright laws[.]"  (*Id.*)  Further, online music service providers "shall purchase music
copyrights in compliance with the principles of fairness and reasonableness, market laws and

international practices, and shall not drive up prices or use vicious bidding, in order to avoid purchasing exclusive copyrights." (*Id.*)

Although TME was directed to cease exclusive licensing, TME continued to withhold licensing of one percent of its music catalog from its competitors, which, according to Plaintiff, was highly anticompetitive. (SAC ¶ 75.) After NetEase complained of TME's ongoing conduct to "the Chinese central government," the National Development and Reform Commission ("NDRC") initiated an investigation at the end of 2017. (*Id.* ¶ 73.) The State Administration for Industry and Commerce ("SAIC") initiated an investigation immediately after. (*Id.* ¶ 80.) On April 10, 2018, China formed the State Administration for Market Regulation ("SAMR"), which took over antitrust enforcement responsibilities from SAIC and NDRC. (*Id.* ¶ 80.) SAMR consolidated the SAIC and NDRC in 2019, and continued investigating TME thereafter. (*Id.*)

On October 2, 2018, TME filed a registration statement with the Securities and Exchange Commission (the "SEC") in connection with its planned IPO on the New York Stock Exchange. (*Id.* ¶ 98.) An amended version of the registration statement ("Registration Statement") was filed on December 10, 2018, and declared effective by the SEC on December 11, 2018. (*Id.* ¶¶ 99– 100.)

The Registration Statement contained several relevant risk disclosures. *First*, TME discussed the potential impact of a changing legal and regulatory landscape in China:

> PRC laws and regulations concerning the online music entertainment industry are developing and evolving. Although we have taken measures to comply with the laws and regulations that are applicable to our business operations and avoid conducting any non-compliant activities under the applicable laws and regulations, the PRC governmental authorities may promulgate new laws and regulations regulating the online music industry in the future. We cannot assure you that our practice would not be deemed to violate any new PRC laws or regulations relating to online music streaming. Moreover, developments in the online music entertainment industry may lead to changes in PRC laws, regulations[,] and policies or in the interpretation and application of existing laws, regulations[,] and policies

that may limit or restrict online reading marketplaces like us, which could materially and adversely affect our business and operations.

(*Id.* ¶ 104.)  *Second*, TME disclosed the September 2017 Meeting:

PRC laws and regulations are evolving, and there are uncertainties relating to the regulation of different aspects of the online music entertainment industry, including but not limited to exclusive licensing and sublicensing arrangements.  Pursuant to an article posted on National Copyright Administration's official website, in September 2017, the National Copyright Administration held meetings with a number of music industry players, including us, where it encouraged the relevant industry players to 'avoid acquiring exclusive music copyright' and indicated that they should also not engage in activities involving 'collective management of music copyright.'  There is substantial uncertainty as to whether some of our current licensing arrangements may be found objectionable by the regulatory authorities in the future.

(*Id.* ¶ 106.)  *Third*, in the Underwriter Agreement attached to TME's Registration Statement, Defendants represented that:

There are no legal, arbitration or governmental proceedings (including, without limitation, government investigations or inquiries) pending to which the Company or any of its Subsidiaries or the Company's directors and executive officers is a party or of which any property of the Company or any of its Subsidiaries is the subject, which if determined adversely to the Company or any of its Subsidiaries, would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect; and to the best of the Company's knowledge, no such proceedings are threatened or contemplated by governmental authorities or threatened by others.

(*Id.* ¶ 109 (emphasis omitted).)  The Underwriter Agreement defined "Material Adverse Effect" as "a material adverse effect on the general affairs, management, financial position, shareholders' equity, results of operations or prospects of the Company and its Subsidiaries taken as a whole."  (*Id.* ¶ 109 n.40.)

Like the Registration Statement, TME's 2018 Annual Report contained various disclosures regarding the risks faced by TME, using substantially the same language in many instances as the Registration Statement.  (*See, e.g., id.* ¶ 124.)

5

According to the SAC, TME's disclosures were misleading because Defendants failed to disclose material information.  That is, "prior to and at the time of the IPO, the Chinese government was conducting an anti-monopoly investigation into [TME's] exclusive licensing practices; [and] the investigation was likely to lead to severe restrictions and/or termination of [TME's] highly profitable exclusive licensing arrangements."  (*Id.* ¶ 102.)  Moreover, Plaintiffs allege that TME's "financial performance was reasonably likely to be materially impacted as a consequence of terminating exclusive agreements with music labels and artists," and that TME "could be subject to material regulatory action leading to penalties and significant financial damages if the Chinese government determined that [it] had violated the PRC Anti-Monopoly Law" based on the ongoing investigation.  (*Id.*)  Specifically, Article 17 of China's Anti-Monopoly Law prohibits companies holding dominant market positions, like TME, from abusing their positions by: "selling products at unfairly high prices or buying products at unfairly low prices"; or, "without justifiable reasons, allowing their trading counterparts to make transactions exclusively with themselves or with the companies designated by them."  (*Id.* ¶ 88.)  Plaintiff alleges that TME violated Article 17 by "sublicense[ing] music tracks to its competitors at unfairly high prices with 100% markup" and by holding "exclusive agreements with the majority of music labels worldwide[.]"  (*Id.* ¶ 89.)  Penalties for violating Article 17 include confiscation of unlawful gains, and a fine of "not less than one percent but not more than 10 percent of [] sales achieved in the previous year."  (*Id.* ¶ 90 n.36.)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of defendants' liability for the alleged misconduct.  *Id*.  While this standard requires more than a "sheer possibility" of defendants' liability, *id*., "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999).  Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id*. (citations omitted).

## DISCUSSION

### I.     Securities Act

Section 11 of the Securities Act imposes liability on issuers and other signatories of a registration statement that, upon becoming effective, "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).

To plead a § 11 claim on the basis of an omission,[2] a plaintiff must allege that the defendant had "a legal obligation to disclose the allegedly omitted information."  *In re Merrill Lynch & Co., Inc. Resch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003).  A duty to disclose may arise "when additional information is needed to make another statement, whether required or voluntarily made, not misleading," or a duty to disclose "may be imposed by statute or by regulation."  *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375

---

[2] Although Plaintiff alleges that the Underwriter Agreement contained a false statement to the extent it said there was not investigation that could materially affect the company (SAC ¶ 110), in her opposition to Defendants' motion to dismiss the SAC, she argues that the representation was "materially misleading because Defendants failed to disclose the ongoing antitrust investigations at the time of the IPO, which would lead to a material adverse effect if resolved against TME."  (Pl.'s Opp'n at 12–13.)  Therefore, the Court considers arguments under an omission theory, and not a false statement theory.  In any event, the analysis set forth above applies to both theories equally.

(S.D.N.Y. 2009), *aff'd sub nom. In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) (explaining with respect to a § 10(b) claim[3] that "half-truths" are statements that are misleading because of what they omit to disclose).

Here, Plaintiff asserts three categories of materially misleading statements. *First*, those where "Defendants misleadingly described the [September 2017 Meeting] as an industry get-together rather than a directive to TME." (Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") at 5, ECF No. 120.) *Second*, where the Registration Statement "misleadingly omitted ongoing investigations." (*Id.* at 12.) *Third*, Defendants' omission that TME was "defying the [September 2017 order] that TME stop violating" China's Anti-Monopoly law. (*Id.* at 16.) The Court addresses each category in turn.

### 1.    September 2017 Meeting

In assessing the allegations of the first amended complaint ("FAC"), the Court concluded that "[t]here [was] no mention of any purported order," nor was there "any allegation to support the inference that TME was the 'target' of the [September 2017 Meeting]." (Mem. & Order, *Gordon v. Tencent Music Ent. Grp.*, 19-CV-5465, 2021 WL 9183821, at *3 (E.D.N.Y. Mar. 31, 2021) (*"Gordon I"*), ECF No. 108.) The Court concluded, moreover, that "the Registration Statement describes the directive of the September 2017 Meeting in largely the same terms as alleged by Plaintiff." (*Id.*) As such, the FAC failed to allege an actionable misstatement concerning the meeting. Plaintiff purports to cure this deficiency by alleging that the NCA indeed issued an order at the September 2017 Meeting, which required TME to cease engaging

---

[3] Analysis regarding whether a statement was a materially misleading statement under § 10(b) is applicable to a § 11 claim. *See Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (noting that the same standard for materially misleading statements applies to § 10(b) and § 11).

in exclusive licensing agreements.  (SAC ¶ 73.)  The SAC also alleges that the September 2017

Meeting was disciplinary in nature, and that the Chinese government invited other companies

only so that they could "observe the discipline" of TME.  (*Id.* ¶ 71.)  According to Plaintiff, these

allegations allow the court to reasonably infer that TME was the target of the September 2017

Meeting, that TME received "specific disciplinary action," and that "[TME] disregarded those

directives," which all gave rise to a duty to disclose "the seriousness of the problems [TME]

faced, so as not to render Defendants' public disclosures inaccurate, incomplete, or misleading."

(Pl.'s Opp'n at 7.)  The Court disagrees.

        As Defendants correctly note, Plaintiff's characterization of the September 2017 Meeting

contradicts the NCA Statement, which was published by the NCA.  (Defs.' Mem. in Supp. Mot.

to Dismiss ("Defs.' Mem.") at 12–15, ECF No. 119-1.)  "Where the complaint's characterization

of the annexed documents conflicts with the actual documents, the court will rely on the

documents themselves."  *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427, 2014 WL

4773991, at *6 (E.D.N.Y. Sept. 24, 2014).  Here, nothing in the NCA Statement supports

Plaintiff's characterization of the September 2017 Meeting as disciplinary in nature, or even

involving an order directed at TME.  For example, the NCA Statement states that "[o]n

September 12, . . . the [NCA] interviewed the principal executives of Tencent Music, AliMusic,

NetEase Cloud Music, and Baidu Taihe Music for the online music copyrights."  (NCA

Statement at 1.)  It does not state, as Plaintiff asserts, that the NCA summoned TME to a

disciplinary meeting and invited others to observe.  The NCA Statement goes on to state that

"[t]he director of [NCA] emphasized that *every* online music service provider shall perform the

main responsibilities in accordance with the requirements of the copyright laws and actively

maintain the hard-won good order of online music copyrights in order to provide better music

services for netizens and listeners."  (*Id.* (emphasis added).)  In other words, the NCA

"emphasized" that all music providers, not only TME, shall perform their responsibilities in

accordance with copyright laws.  Significantly, nothing in the NCA Statement indicates that

TME had broken any law or that TME was subject to discipline.  Indeed, nothing in the NCA

Statement indicates that TME was ordered to rid itself of exclusive copyrights.  Instead, like all

music service providers, TME had to "purchase music copyrights in compliance with the

principles of fairness and reasonableness . . . and [] not drive up prices or use vicious bidding, in

order to avoid purchasing exclusive copyrights."[4]  (*Id.* at 4.)  Against this backdrop, the Court

declines to adopt Plaintiff's new characterization of the September 2017 Meeting because it

contradicts the NCA Statement.[5]  *See Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-

261, 2011 WL 1655575, at *8 (E.D.N.Y. May 2, 2011) (disregarding an allegation in the

complaint because it was contradicted by a document that was integral to complaint); *Rapoport*

*v. Asia Elecs. Holding Co., Inc.*, 88 F. Supp. 2d 179, 184–85 (S.D.N.Y. 2000) (dismissing

securities complaint where documents relied upon contradicted allegations in amended

complaint).  As the Court previously found, Defendants disclosed the September 2017 Meeting

in largely the same terms as the NCA Statement, and even directed investors to the NCA

Statement.  (*See Gordon I*, 2021 WL 9183821, at *3–4.)

---

[4] Plaintiff attached to her opposition to the motion to dismiss the SAC a revised translation of the NCA Statement that states, "they . . . shall not drive up prices or use vicious bidding, and shall avoid purchasing exclusive copyrights."  (Pl.'s Opp'n at 11 n.9.)  Even if the Court were to refer to the revised translation, the Court's conclusion remains unchanged.

[5] The Court cannot help but note as well that the FAC described the meeting quite differently:  "On September 12, 2017, [NCA] summoned principal executives from [TME] and its major competitors NetEase Cloud, [TME] and Baidu Taihe and notified them that their battles over exclusive licensing had been on the government's radar. [NCA] specifically warned these companies that they should avoid purchasing exclusive copyright and eliminate the obstacles that are hindering expansive licensing of online music."  (First Am. Compl. ¶ 70.)  There is no mention of discipline or an order directed exclusively at TME.

Resisting this conclusion, Plaintiff effectively asks the Court to ignore the NCA Statement in favor of her own characterization of the meeting based upon Witness 1's statements.  (*See* Pl.'s Opp'n at 7 n.6.)  Witness 1 asserts that "the government's September 2017 Order to online music platforms forbidding them from engaging in exclusive licensing agreements, issued at the [September 2017 Meeting], resulted from the intensification of the fight between [TME] with its competitor NetEase.  The September 2017 Order plainly resolved the dispute *in favor of* NetEase and *against* [TME], because it was [TME] that was engaging in monopolistic practices."  (SAC ¶ 73.)  But, Witness 1 provides no specific information derived from the meeting that might support this assessment.  For example, Witness 1 provides no statements suggesting that, although other online music service providers were present, any directive by the NCA was made specifically to TME alone.  Likewise, Witness 1 does not provide specific statements that suggest the tone of the meeting was disciplinary or was otherwise any different from NCA's description in the NCA Statement.  Indeed, Witness 1's personal conclusions are far from the "behind closed doors" information that Plaintiff argues them to be.  (*See* Pl.'s Opp'n at 6.)  Rather, Witness 1's information is better described as a characterization.  And, it is a characterization that conflicts with the NCA Statement.  Tellingly, Witness 1's current characterization of the meeting is directly contradicted by his report in the FAC.  He previously described the September 2017 Meeting only as "a warning to online music platforms against entering into exclusive licensing agreements."  (First Am. Compl. ¶ 77, ECF No. 23.)  Further compromising Plaintiff's claim, she fails to account for the discrepancy between her characterization of the meeting and the NCA Statement.  Put differently, Plaintiff provides no explanation for why the NCA Statement did not characterize the September 2017

Meeting as disciplinary, accuse TME of breaking the law, or direct TME specifically to cease its alleged unlawful activity.

As she did in her opposition to Defendants' previous motion to dismiss, Plaintiff attempts to liken her case to *Christine Asia v. Ma*, 718 F. App'x 20 (2d Cir. 2017), but it remains distinguishable.  There, the defendants disclosed "that [Alibaba] received complaints about intellectual property infringement on its sites, and it warned investors that it might be accused of facilitating such conduct in the future."  *Christine Asia Co., Ltd. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 471 (S.D.N.Y. 2016), *rev'd.* 718 F. App'x. 20 (2d Cir. 2017).  The defendants also disclosed that they adopted measures to remedy the problem but that "these measures may not always be successful."  *Id.* at 464.  However, the defendants failed altogether to disclose that they had been summoned to an administrative guidance meeting at which the SAIC gave Alibaba the Hobbesian choice to either "cease[] to host a marketplace for the sale of counterfeit goods on its website [or] be subjected to huge repeating fines of 1% of daily gross merchandise value sold on Alibaba's e-commerce platforms."  *See* 718 F. App'x at 22.  The "seriousness of the problems Alibaba faced" was not the regulatory attention itself, but the specific threat of imminent punishment.  *Id.* at 23.

Although Plaintiff maintains that TME's disclosures downplayed the seriousness of the meeting because they suggest that TME would not "suffer adverse consequences if it failed to" follow the directives from that meeting (Pl.'s Opp'n at 8), the SAC fails to plead any specific threat of consequences.  In short, unlike *Christine Asia*, Plaintiff complains only that Defendants did not characterize the meeting in a more negative light, not that specific and material negative details of the meeting were concealed.  Therefore, for the same reasons explained in the Court's

previous memorandum and order dismissing the FAC, the SAC fails to state an omission based upon the September 2017 Meeting.[6]   (*See Gordon I*, 2021 WL 9183821, at *3–4.)

### 2.    Government Investigation

In its prior order, the Court concluded that the FAC "alleged only that there was a government investigation" but lacked any "plausible allegation that TME was aware of any material impact of any investigation on TME" necessitating disclosure.  (*Id*. at *5–6.)  None of the newly pleaded allegations changes the Court's conclusion.  According to the SAC, Defendants represented in the Underwriting Agreement that there were no pending, threatened, or contemplated governmental investigations or inquiries that could have a material adverse effect on TME if determined adversely to the company.  (*See* SAC ¶ 109.)  That representation, according to Plaintiff, is materially misleading "because Defendants failed to disclose the ongoing antitrust investigations at the time of the IPO, which would lead to a material adverse effect if resolved against TME."  (Pl.'s Opp'n at 12–13.)  But, a close examination of the SAC and its appended documents reveals that, although TME was subject to governmental investigations, there are no allegations from which the Court may infer that an unfavorable determination resulting from those investigations would have had a material adverse effect on TME.

---

[6] In arguing that the SAC has plausibly alleged a Section 11 violation based upon the September 2017 Meeting, Plaintiff relies heavily upon Judge Merkl's determination that an amendment would not be futile.  (*See* Pls.' Opp'n at 7.)  Of course, as Judge Merkl's memorandum and order stated, "[a] magistrate judge's grant of a motion to amend a complaint is generally considered non-dispositive."  (Mem. & Order at 7 n.5 (citing *Lubavitch of Old Westbury, Inc. v. Inc. Vill. of Old Westbury*, No. 08-CV-5061, 2021 WL 4472852, at *8–9 (E.D.N.Y. Sept. 30, 2021)), ECF No. 115.)  And, more importantly, the proposed amended complaint Judge Merkl reviewed is different from the SAC.  As Defendants correctly point out, the proposed amended complaint referred to an order that was issued at the September 2017 Meeting, but did not clarify the order is nothing more than what is stated in the NCA Statement, which was disclosed to investors.  (*Compare* Proposed Second Am. Compl. ¶¶ 71–71 *with* SAC ¶¶ 71–73.)

Plaintiff's theory hinges on her allegations that NDRC and SAIC each launched antitrust investigations into TME roughly one year before the IPO, and that TME was "abusing [its] market position" in violation of Article 17 of China's Anti-Monopoly law, which could result in substantial penalties.[7]  (SAC ¶¶ 79–80, 88–90.)  But, this argument is a sleight of hand.  There is no allegation in the SAC that SAIC or NDRC were investigating TME for abusing its market position.[8]  (*See generally* SAC.)  To the contrary, Exhibit 4 to the SAC expressly states that TME was not under threat of an abuse of market position sanction:  "[T]he State Administration for Market Regulation did not choose to establish the case for 'abuse of a dominant position in the market.'  Rather, it considered whether the infringing actions constituted potential vertical monopoly agreements aiming to exclude and restrict competition."  (Ex. 4 at 4, SAC, ECF No. 116-4.)  And, Plaintiff has failed to allege or otherwise establish that "vertical monopoly agreements" constitute an abuse of market position, or that such conduct would otherwise subject TME to the substantial penalties attached to "abuse of market position."  Without these allegations, the SAC is in the exact same position as the FAC.

---

[7] Article 47 of China's Anti-Monopoly Law provides that "[w]here a company . . . abuses its dominant market position, the authority for enforcement of the Anti-Monopoly Law shall instruct it to discontinue such violation, confiscate its unlawful gains and, in addition, impose on it a fine of not less than one percent but not more than 10 percent of its sales achieved in the previous year."  (SAC ¶ 90 n.36.)

[8] To be sure, the SAC attached as an exhibit a PaRR article, which asserted that TME was "facing abuse of dominance allegations in China following complaints from competitor NetEase Cloud Music."  (Ex. 5, Compl., ECF No. 116-5.)  But, as to the details of the investigations by NDRC and SAIC, the article states "NDRC launched the *probe* first and the SAIC followed soon after, with the latter sending a questionnaire to [TME]."  (*Id.*(emphasis added).)  It goes on to state that "the probes were not formal investigations" and noted that, according to an unnamed source, "there is no independent data on [TME's] market share in China."  (*Id.*)  The Court declines to infer based on the PaRR article, which Plaintiff tacitly acknowledges contains an inaccuracy as to the formal versus informal investigation distinction (*see* Pl.'s Opp'n at 14.), that the NDRC and SAIC were investigating TME for abuse of market position violations.  Instead, synthesizing Plaintiff's exhibits together, the more reasonable inference is that TME was investigated for "potential vertical monopoly agreements" and that "certain foreign media outlets," like PaRR, incorrectly "reported that [TME] was under Chinese investigation for suspicion of abusing its dominant position in the market."  (Ex. 4 at 5, Second Am. Compl, ECF No. 116-4.)

Plaintiff's renewed attempt to liken this case to *Menaldi v. Och-Ziff Capital Management Group* and *Christine Asia* is perplexing.  In *Och-Ziff*, the plaintiffs pleaded that the defendants admitted for the first time in a restated Form 10-K that an adverse outcome of a regulatory investigation could have a material adverse effect on the company.  *See* 164 F. Supp. 3d 568, 584 (S.D.N.Y. 2016) ("When [the defendant] filed its restated 10-K . . . [the defendant] stated that an adverse outcome [of the investigation] could have a material effect on [its] business, financial condition or results of our operations." (quotation marks omitted and alterations supplied)).  No such admission is alleged in the SAC.  Instead, the SAC contains nothing more than Plaintiff's speculation as to the possible adverse consequences of an investigation.  In *Christine Asia*, the plaintiffs plausibly pleaded that the defendants failed to disclose a meeting with SAIC, at which it was offered an ultimatum.  *See* 718 F. App'x at 22.  Notably, that allegation was based upon a blogger's report, not the plaintiff's conjecture.  *See Chrstine Asia*, 192 F. Supp. 3d at 462 ("One Chinese blogger, who is not alleged to be affiliated with the Chinese government or Chinese mainstream media, reported, without identifying a source, that 'some participants in the July 16 meeting revealed' that the SAIC's Director General warned Alibaba during the meeting that the SAIC was prepared to 'penalize Alibaba . . .'").  In other words, the material adverse effect in *Christine Asia* was both supported and imminent.  Plaintiff attempts to create an imminent threat here by connecting the September 2017 Meeting to the investigations, and asks the Court to infer that TME was being investigated for abuse of market position, thereby threatening TME with the attendant penalties.  But, this is not a reasonable inference to draw in light of Plaintiff's own exhibits.  The September 2017 Meeting involved the NCA, a different agency from those that later investigated TME, and Plaintiff has not alleged any facts suggesting coordination between the NCA and the other agencies.  Further, the SAC provides zero detail into the aims of

15

investigations other than that the focus was on exclusive copyrights.  Without more, the SAC, for the same reasons as the FAC, fails to allege that Defendants omitted material information about any investigation.[9]  (*See Gordon I*, 2021 WL 9183821, at *4–6.)

### 3.   Violation of Chinese Anti-Monopoly laws

The Court previously held that the FAC failed to establish any duty to disclose alleged anti-competitive conduct.  (*Id.* at *6–7.)  According to Plaintiff, the SAC establishes that Defendants' representation in the Registration Statement that TME "ha[d] taken measures to comply with the laws and regulations . . . and avoid conducting any non-compliant activities under the applicable laws and regulations" was materially misleading.  (Pl.'s Opp'n at 16.)  Here again, Plaintiff's argument relies upon her characterization of the September 2017 Meeting as having included an "order" to cease purchasing exclusive copyrights.  The Court has already rejected this characterization of the September 2017 Meeting.[10]  Thus, for the same reasons as the FAC, the SAC fails to allege any actionable omission concerning compliance with Chinese law.[11]  (*See Gordon I*, 2021 WL 9183821, at *6–7.)

---

[9] Plaintiff's other arguments concerning the possible adverse outcomes of the investigations are likewise meritless. A number of the material adverse outcomes are premised upon Plaintiff's characterization of the September 2017 Meeting, which the Court already rejected because it is contradicted by the NCA Statement.  (*See* Pl.'s Opp'n at 13.) Plaintiff also argues that the investigation could have a material adverse outcome because analysts in 2019 recommended against purchasing TME stock in light of the later investigation and because TME's stock price declined after that investigation was revealed.  (*See id.* (citing SAC ¶¶ 86, 126–28).)  But, this says nothing about whether the NDRC and SAIC investigations could have resulted in an adverse determination that would have a material adverse effect on TME.  *See In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 9–10, 12–16 (S.D.N.Y. 2016) (no duty to disclose investigation despite drop in stock price upon adverse determination resulting from investigation).

[10] Moreover, the SAC demonstrates that the statement is literally true.  The SAC alleges that after the meeting, TME sublicensed 99 percent of its music library, which is reasonably considered a "measure to comply with the laws and regulations."  That Plaintiff viewed that measure, in retrospect, to be insufficient does not make the statement misleading.

[11] Plaintiff also argues, as with the FAC, that Items 303 and 503 created a duty to disclose more information about the September 2017 Meeting, the government investigations, and that TME was allegedly violating Chinese law. (Pl.'s Opp'n at 16–17.)  Because the Court has determined that the SAC suffers the same deficiencies as the FAC, the SAC, like the FAC, fails to establish a duty to disclose pursuant to these items.  (*See Gordon I*, 2021 WL 9183821, at *7.)

In sum, because the SAC fails to plead any materially misleading statement, Plaintiff's Securities Act claims must be dismissed.

## II.     Exchange Act

To state a claim for relief under § 10(b) and Rule 10b–5, a plaintiff must allege that defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff relied; and (5) that plaintiff's reliance was the proximate cause of their injury.  *See Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).  As the Court has already found that there is no material misstatement or omission in the Registration Statement, the only potential basis for Plaintiff's Exchange Act claims are statements made in the Annual Report.  As with the FAC, the only difference between the Annual Report and the Registration Statement "is that the Annual Report was published on April 19, 2019 . . . after the official investigation into TME was launched in January 2019."  (*Gordon I*, 2021 WL 9183821, at *8.)  And, as the Court previously held, "the existence of a government investigation alone does not create a duty to disclose."  (*Id.*)  Accordingly, Plaintiff's Exchange Act claims fail.[12]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the SAC is GRANTED.

SO ORDERED.

Dated: Brooklyn, New York
       March 31, 2023

/s/ LDH
LASHANN DEARCY HALL
United States District Judge

---

[12] Because Plaintiff's Section 10(b) claim fails, her Section 20A claim fails as well.  *See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 703 (2d Cir. 1994) ("[T]o state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations.").